## THE THOMAS BARLUM.

### THE JOHN J. BARLUM.
#### Nos. 175, 176.

Circuit Court of Appeals, Second Circuit.
Feb. 5, 1934.

See, also, 56 F.(2d) 455.

George E. Brand, of Detroit, Mich., and Burke & Desmond, of Buffalo, N. Y., for appellants.

Miller, Canfield, Paddock & Stone, of Detroit, Mich., and Stanley & Gidley, of Buffalo, N. Y., for appellees.

Before MANTON, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

MANTON, Circuit Judge.

These suits in admiralty, tried together, were instituted to foreclose two ship preferred mortgages on appellant's vessels, the Thomas Barlum and John J. Barlum, each for $200,000. Each was a preferred mortgage, executed in the form required and filed pursuant to the Ship Mortgage Act (46 USCA §§ 911–984). The foreclosure of the mortgage lien was taken pursuant to section 30, subsec. K (46 USCA § 951).

The Barlum Steamship Company is a West Virginia corporation and owned these steamers plying the Great Lakes. There were fourteen stockholders of the corporation. Of a total of 3,200 shares, 2,561 were held by John J. Barlum. This shareholder was interested in real estate holdings which were held in separate corporations. The steamship company had no stock interest or assets in any of these real estate corporations.

In February, 1929, the appellee, through its vice president, negotiated and consummated a loan of $200,000 secured by the mortgage on the Thomas Barlum now in suit, guaranteed by John J. Barlum. A document setting forth the agreement between the parties showed that $50,000 of the loan secured by this mortgage was to pay a note then outstanding, secured by a previous mortgage on the ship, $1,225 to pay interest, attorney's fees, fees due the trustee, cost of printing the bonds, and $100,000 to take up a debt of that amount owed by John J. Barlum and Thomas Barlum & Sons. The balance of about $42,775 was to be used for repairs and refitting the steamers Thomas Barlum and John J. Barlum for the seasons of 1929. The $100,-000 debt of Barlum and Thomas Barlum & Sons had no relation to the appellant or its vessels. The officer of appellee was fully informed of the details of the debt and that it was contemplated that it should be paid as stated. The mortgage was executed and delivered March 22, 1929, when the vessel was laid up. The appellant's home office was in Detroit, Mich., and an application, prepared by the appellee, was filed with the Securities Commission of that state stating that refinancing was the purpose of this issue. The sum of $42,896.44 given to the Barlum Steamship Company was placed in the bank account "Steamer John J. Barlum" at the National Bank of Commerce. There was paid out of it about $22,000 of the accounts relating to the John J. Barlum and $20,000 of the balance was transferred to the bank account "Steamer Thomas Barlum" at another bank, out of which were paid accounts allocated to the Thomas J. Barlum on account of its previous season's operations. A written authorization was given by the appellant to appellee to dispose in this manner of the proceeds of the bonds thus sold.

The mortgage on the John J. Barlum was executed January 5, 1928, after being prepared by the appellee's attorneys. It was understood that $82,281.25 was to be withheld by the appellee to pay $50,000 principal and $32,281.25 interest on a $1,250,000 bond issue and mortgage executed by John J. Barlum and his wife to the appellee trust company on individual real estate and leaseholds held by them and also $10,000 was to be retained by the trust company and applied to the payment of an individual note executed by Barlum for a personal loan from appellee. The appellant had no connection with these items of expense, and allowances to the trustee and the attorney, which were withheld according to the agreement. From the remainder there was paid to the engineer of the Thomas Barlum $500; $500 was paid to the captain of the John J. Barlum; $2,000 was transferred to the account "Steamer John J. Barlum"; and the balance was used to pay off loans made to Barlum and his companies other than appellant. Thus, out of the entire proceeds of the issue, but $2,500 was transferred to the account of the John J. Barlum or used in connection with it.

It is admitted that there was a default in each of the mortgages, which contained provisions for foreclosure by seizure and sale without legal process.

Appellant contends that subsection K of the Ship Mortgage Act (section 30, subsec. K, Merchant Marine Act of 1920, 46 USCA § 951) allowing foreclosure of the vessels' preferred mortgages in admiralty, does not apply. And if subsection K does apply, it is contended that it is unconstitutional and not

within Art. 3, § 2, of the Constitution, providing that the judicial power shall extend to all cases of admiralty and maritime jurisdiction. Congress, by section 9 of the Judiciary Act of 1789, conferred such jurisdiction on the District Courts saving to suitors in all cases the right to a common-law remedy where the common law is competent to give it (28 USCA § 41, subd. 3).

The Merchant Marine Act of June 5, 1920, section 30 of which is called the Ship Mortgage Act, had as its purpose, expressed in section 1 of the act (46 USCA § 861), the development of a merchant marine and the disposal of the vessels and shipping property held by the United States Shipping Board. In furtherance of that purpose, section 30 of the act (46 USCA § 911 et seq.) provided generally for the recordation of ship mortgages and especially for the creation and enforcement of a class of preferred mortgages in order that the rights of both mortgagees and others dealing with United States vessels might be clearly defined. It was hoped that regulation of ship mortgages would attract capital to shipping. Senate Reports, vol. 1, 66th Congress, 2d Session. These preferred mortgages were utilized as the security taken by the Board in the form of purchase-money mortgages in cases of sales of vessels by the Board. Morse Drydock & Repair Co. v. Northern Star, 271 U. S. 552, 46 S. Ct. 589, 70 L. Ed. 1082; The Oconee (D. C.) 280 F. 927.

Subsection D of section 30 (46 USCA § 922) provides how a valid mortgage may obtain a preferred status. Subsection K (46 USCA § 951) provides for enforcing the mortgage by a suit in rem in admiralty.

■■ Appellant argues that these mortgages, as the record establishes, were so devoid of connection with maritime purposes and subjects, that the statute should not be construed to confer and cannot confer original jurisdiction of foreclosure in admiralty. It is not disputed that Congress may legislate to confer such jurisdiction as to true maritime liens (Morse Drydock & Repair Co. v. Northern Star, supra; Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. Ed. 598; The Nanking [D. C.] 292 F. 642), but Congress has no power to confer jurisdiction in admiralty to litigate a nonmaritime contract. The J. E. Rumbell, 148 U. S. 1, 13 S. Ct. 498, 37 L. Ed. 345; The Lottawanna, 21 Wall. (88 U. S.) 558, 22 L. Ed. 654; Schuchardt v. The Angelique, 19 How. (60 U. S.) 239, 15 L. Ed. 625; People's Ferry Co. v. Beers, 20 How. (61 U. S.) 393, 15 L. Ed. 961; Bogart v. The Steamboat John Jay, 17 How. (58 U. S.) 399, 15 L. Ed. 95; The Genesee Chief, 12 How. (53 U. S.) 443, 13 L. Ed. 1058; Pillsbury Flour Mills Co. v. Interlake S. S. Co., 40 F. (2d) 439 (C. C. A. 2). And Congress did not intend to conflict with the rights of the state tribunals to enforce contracts governed by their own laws and not strictly of a maritime nature.

■ If it were established that these mortgages were given to support an issue of bonds "to develop and encourage the maintenance of such a merchant marine" and therefore in accord with the objects of the Ship Mortgage Act, the admiralty jurisdiction to foreclose would be unquestionable. We need not decide whether or not a loan made for maritime purposes secured by a mortgage on a ship will become nonmaritime if the borrower, contrary to the agreement of the mortgage, diverts the money to nonmaritime purposes, nor need we consider what effect any estoppel in such a case would have. We are not called upon to say whether or not Congress could in any event extend the admiralty jurisdiction to a matter so closely related to transportation by navigable waters as to provide for the exclusive enforcement in admiralty of a mortgage on a ship actually engaged in such transportation. It is sufficient to point out here that the mortgagor and mortgagee both knew in advance of making these mortgages that the moneys advanced were not to be used for such purposes, but were intended for and actually were used for nonmaritime purposes. This was fully disclosed at the trial. In the absence of an express provision, the Ship Mortgage Act will not be construed to extend to such a case.

■ It has been recognized that the determination of what is a maritime contract depends upon the nature of the contract which means its substance. North Pac. S. S. Co. v. Hall Bros. Machine Ry. & Shipbuilding Co., 249 U. S. 119, 39 S. Ct. 221, 63 L. Ed. 510. Contracts of a mixed nature are not cognizable in the admiralty courts, and, where the principal subject-matter of the controversy belongs to the jurisdiction of a court of common law or of equity, the incidental matters must always be relegated to the appropriate jurisdiction, although of themselves they may be cognizable in admiralty. The Pennsylvania, 154 F. 9 (C. C. A. 2). The whole contract must be maritime in its character, and, when the performance is partly maritime and partly terrene, a court of admiralty will not assume jurisdiction over it unless the nonmaritime features be inconsiderable. Pillsbury

Flour Mills Co. v. Interlake S. S. Co., supra; The Poznan, 9 F.(2d) 838 (C. C. A. 2); The Richard Winslow, 71 F. 426 (C. C. A. 7). In Crowell v. Benson, 285 U. S. 22, 55, 52 S. Ct. 285, 294, 76 L. Ed. 598, it was said: "In amending and revising the maritime law, the Congress cannot reach beyond the constitutional limits which are inherent in the admiralty and maritime jurisdiction. Unless the injuries to which the act relates occur upon the navigable waters of the United States, they fall outside that jurisdiction. * * * Again, it cannot be maintained that the Congress has any general authority to amend the maritime law so as to establish liability without fault in maritime cases, regardless of particular circumstances or relations."

■ It was not the intention of Congress, by the mere grant of jurisdiction under the terms of the Ship Mortgage Act, to confer jurisdiction on the federal court to foreclose a mortgage lien placed on the vessel which was not made a maritime lien for navigation or shipping purposes within the statute. In granting such jurisdiction, Congress could have intended only a valid preferred mortgage thus authorized to be made under the terms of the Ship Mortgage Act. It must be a transaction which relates to navigation and things maritime.

■ It is not enough to say that they were mortgages with due formalities placed upon the vessels. As soon as it appeared at the trial, and it did so beyond question, that the loan was not made to be used for purposes of navigation or relating to things maritime, the court should have declined jurisdiction. In The Winnebago, 141 F. 945, 949 (C. C. A. 6), the court said: "The owner of a ship may make a nonmaritime contract and mortgage his ship to secure it, or it may be seized on mesne or final process; and in both cases the ship may be sold for the satisfaction of the debt on the order of a common-law court without recourse to the admiralty jurisdiction." And this alone can be the remedy of the mortgage once its nonmaritime character is disclosed.

■ The act, to be sure, does not say anything about how this loan secured by the mortgage, is to be used. But a maritime use or some use aiding the purpose of the statute was contemplated, and, when the parties negotiate a loan foreign to that purpose, the mortgage securing the loan is not within the act, even though the formalities are observed so far as

admiralty jurisdiction is concerned for foreclosure. Nowhere in the Merchant Marine Act or the Ship Mortgage Act is it anywhere shown that Congress intended that ship mortgages given by owners to support outside operations such as real estate ventures or to pay past debts not arising in maritime transactions were in contemplation. Mortgage loans of this character are foreign to the idea of maritime operations. The mortgages in question having been shown to be nonmaritime in intent and character, the admiralty court did not have jurisdiction, and the application to dismiss the suit should have been granted.

Decree reversed.

AUGUSTUS, N. HAND, Circuit Judge (dissenting).

The question before us on this appeal is whether two mortgages, one on the steamer Thomas Barlum, and the other on the steamer John J. Barlum, belonging to the Barlum Steamship Company, are preferred mortgages constituting liens upon the mortgaged vessels which may be enforced by suit in rem in admiralty pursuant to the Ship Mortgage Act (46 USCA § 911 et seq.).

Each mortgage was made by the Barlum Steamship Company after proper corporate action authorizing its execution and in all respects complied with the provisions of the Ship Mortgage Act as to recording in the office of the collector of customs, indorsement upon the vessel's documents and filing of the required statutory affidavit that the mortgage was made in good faith and without any design to hinder, delay, or defraud any existing or future creditor of the mortgagor or any lienor of the mortgaged vessel. The resolutions of the board of directors of the corporation which authorized the execution of the mortgages recited that it was necessary to borrow the amounts to be secured by the respective mortgages "for the use and benefit" of the steamer that was mortgaged.

The objection made to each of these indentures as a "preferred mortgage" is that the mortgagee advanced money to the mortgagor knowing that the greater part of it would not be used for any maritime purpose, but would be employed to pay off prior debts of the mortgagor to the Detroit Trust Company, as well as to pay indebtedness to the trust company of others than the mortgagor.

The Detroit Trust Company purchased the bonds of which these mortgages were the security and thereafter sold them to the public

or held them as investments for various estates of which it was the trustee.

The appellants contend (a) that the Ship Mortgage Act never authorized mortgages to be given the status of preferred mortgages if made for nonmaritime purposes; (b) that, if it did, the act was, to that extent, unconstitutional; (c) that a mortgage made for a nonmaritime purpose cannot be foreclosed in a United States District Court.

It seems reasonably clear that the Ship Mortgage Act renders all mortgages upon the whole of any vessels of 200 gross tons and upwards that are documented under the laws of the United States *preferred* mortgages, provided they are *valid* mortgages and the owner has complied with the provisions of subsection D of section 30 of the Ship Mortgage Act (46 USCA § 922).

Inasmuch as the mortgages we are dealing with were duly authorized and executed by the corporation that owned the vessels, they were unquestionably valid as mortgages, and, since the owner complied with all the provisions of subsection D of the Ship Mortgage Act relating to *preferred* mortgages, they attained a preferred status.

Section 1 of the Merchant Marine Act (46 USCA § 861) declares it "to be the policy of the United States to do whatever may be necessary to develop and encourage the maintenance of * * * a merchant marine of the best equipped and most suitable types of vessels. * * *" In the light of this recital, it is argued that the mortgages here should not be accorded the status of preferred mortgages for the reason that the moneys advanced upon the vessels were largely used for purposes having no relation to the building or repairing of ships, and almost all the transactions connected with the use of the advances were outside of the objects which Congress had in mind when it created a preferred class of mortgages on ships.

But it cannot fairly be said that the only way to develop and encourage a merchant marine is to follow closely the traditional path of the admiralty law and to give mortgage liens upon vessels priority over maritime liens in no cases except where contracts are involved that are maritime in the sense sanctioned under the general doctrines of that law. It may well be that the building of ships and the investment of capital therein can best be promoted by allowing vessels to be hypothecated as readily and with the same effect as other personal property. If ship mortgages are accorded such a status, there is ground for supposing that they can be employed more advantageously than heretofore.

Prior to the passage of the Ship Mortgage Act, the Senate Committee had reported that "mortgage security on ships now is practically worthless." It may be that the unrestricted right to impose first liens on ships is as likely to promote investment in shipbuilding as is the unrestricted right to mortgage real estate to encourage investment in lands and building. In each case complete freedom to give an underlying lien may tend to enlarge the field to commercial enterprise. Individuals or corporations may be far more ready to build or to buy ships if they know that they can raise money needed for any purpose by placing a mortgage lien upon such vessels that will not be subject to future maritime claims.

Moreover, a mortgage on a ship will always be a most undesirable security if those purchasing the bonds which it secures must at their peril go beyond the corporate resolutions authorizing the mortgage and ascertain aliunde how moneys advanced upon the mortgage are to be spent. These difficulties disappear, and the investment becomes in fact what it purports to be in form if, in order to give a mortgage priority, it is only necessary that it be properly authorized and executed and that the provisions of the statute respecting it be complied with. Such data can be ascertained from the corporate and public records by the same sort of examination that is made to discover whether a chattel mortgage is valid. In other words, a purchaser of bonds secured by a mortgage on a ship will not have to look into matters dehors the record and unravel all sorts of transactions that may have occurred between the mortgagor and mortgagee before he can learn the real nature and extent of his security. As soon as the mortgagor records his mortgage in the proper office and takes the other steps prescribed by the act, it becomes ipso facto a preferred mortgage. To make its status depend upon the purposes for which it is given is to engraft upon the plain words of the statute an exception which seems to be contrary to its terms and to be required by no convincing reasons of public policy.

To limit the lawful incidence of preferential mortgages to securing priorities for sums advanced for the purchase, building, repairing, or fitting out of ships would often seriously interfere with refinancing by corporations engaged in shipping which might be vital to their needs, such as placing preferred

mortgages on vessels in order to pay off existing overdue mortgages having no preferential status.

I think it manifest that by the Ship Mortgage Act Congress provided means for giving any valid mortgage a preferred status and that the mortgages now under consideration are, within the meaning of that act, preferred mortgages.

But it is said that Congress had no power to give mortgages securing sums to be used for nonmaritime purposes a preferential status. This contention is based upon the decisions of the Supreme Court in Bogart v. The Steamboat John Jay, 17 How. 399, 15 L. Ed. 95; Schuchardt v. Ship Angelique, 19 How. 239, 15 L. Ed. 625; The Lottawanna, 21 Wall. 558, 22 L. Ed. 654 and The J. E. Rumbell, 148 U. S. 1, 13 S. Ct. 498, 37 L. Ed. 345, where it was held that a mortgage upon a ship was not a maritime contract and might not be foreclosed in admiralty. Indeed, this was the former rule in admiralty of the English courts. The Neptune, 3 Hagg. Adm. 132. But, at the times when these decisions were rendered, there was no statute of the United States authorizing the imposition of a preferred mortgage lien or providing for foreclosure in admiralty.

Subsection K of section 30 of the Ship Mortgage Act (46 USCA § 951) specifically provides that:

"Upon the default of any term or condition of the mortgage, such lien may be enforced by the mortgagee by suit in rem in admiralty.

"Original jurisdiction of all such suits is granted to the district courts of the United States exclusively."

In Bogart v. The Steamboat John Jay, 17 How. 399, 402, 15 L. Ed. 95, while the Supreme Court refused to sustain a libel founded upon a mortgage on the steamer John Jay, it adverted to the enlargement of admiralty jurisdiction in England which had then recently occurred, through the enactment of legislation relating to mortgages on ships, and recognized that Congress had similar power which it might exercise when it chose. Wayne, J., said:

"It is true that the policy of commerce and its exigencies in England have given to its admiralty courts a more ample jurisdiction in respect to mortgages of ships, than they had under its former rule, as that has been given in this opinion. But this enlarged cognizance of mortgages of ships has been given there by statute 3 and 4 Victoria, ch. 65. Until that shall be done in the United States, by Congress, the rule, in this particular, must continue in the admiralty courts of of the United States, as it has been."

Again in White's Bank v. Smith, 7 Wall. 646, 655, 19 L. Ed. 211, the Supreme Court expressed a similar view when referring to the act of Congress requiring the recording of mortgages on ships in order to give notice thereof to others than the mortgagor, his heirs and devisees. Nelson, J., said:

"Some question is made as to the power of Congress over the title and property of vessels of the United States to such an extent as to enable it to pass a recording act.

"But, after the regulation of this species of property by the several acts of Congress to which we have referred, and in respect to which there has never been a question, there can be very little hesitation in conceding the power to protect the rights of subsequent bona fide purchasers and mortgagees therein."

Article 3, § 2, of the Constitution, extends the judicial power to "all Cases of admiralty and maritime Jurisdiction." The "admiralty and maritime Jurisdiction" is limited to such matters as fall within the reasonable meaning of these words. But within the "admiralty and maritime" sphere Congress has the power to "alter, qualify or supplement" the maritime law both in substance and procedure "as experience or changing conditions * * * require" (Panama R. R. Co. v. Johnson, 264 U. S. at page 386, 44 S. Ct. 391, 393, 68 L. Ed. 748), and has exercised this power again and again. It vitally modified both substantive law and procedure by the enactment of the statute for limitation of liability. Perhaps the widest revision of earlier doctrine for the supposed encouragement of the shipping industry occurred when the Supreme Court in Richardson v. Harmon, 222 U. S. 96, 32 S. Ct. 27, 56 L. Ed. 110, allowed the owners of a barge which had come into collision with a railroad bridge across a navigable stream to limit their liability, though it had long been settled law that the tort was nonmaritime and not within the cognizance of an admiralty court. The Plymouth, 3 Wall. 20, 18 L. Ed. 125; The Troy, 208 U. S. 321, 28 S. Ct. 416, 52 L. Ed. 512. Important modifications of the maritime law were effected through the incorporation in the Merchant Marine Act of 1920 (46 USCA § 861 et seq.), of the Federal Employers' Liability Act (45 USCA §§ 51–59), and through the Long-

952

shoremen's and Harbor Workers' Compensation Act (33 USCA §§ 901–950).

It is argued that the language of the Chief Justice in Crowell v. Benson, 285 U. S. at page 55, 52 S. Ct. 285, 294, 76 L. Ed. 598, indicates that the power of Congress to amend and revise the maritime law is so limited that a preferred status cannot be given by the Ship Mortgage Act to mortgages for advances to be employed for other than maritime purposes. But I can see nothing in the opinion that bears out this contention. It is merely said that "Congress cannot reach beyond the constitutional limits which are inherent in the admiralty and maritime jurisdiction," and that unless the injuries to which the Longshoremen's Act relates occurred upon the navigable waters of the United States, they fall outside that jurisdiction. This is no more than saying that, if the injury to the employee occurred on land, the cause of action was not maritime, whatever may have been the relation of the employee to maritime affairs. I cannot see how it can be inferred from this that Congress lacks power to subordinate maritime liens to mortgages which have been placed upon ships. A ship is not only the very symbol, but the instrument, of maritime jurisdiction, and the same power which can amend the maritime law by imposing a lien for supplies furnished at a home port may subordinate maritime liens to a mortgage which the owner of the vessel has placed upon it. The whole matter is one of creating and displacing liens upon ships which are essentially marine instrumentalities and over which Congress under its maritime jurisdiction has complete control. That it cannot determine what is best to promote the development of these instrumentalities and to regulate their use seems to me quite incredible.

If Congress in the exercise of its jurisdiction has the power to impose liens that are new to the maritime law and to limit liabilities that are old, it may surely provide for the enforcement of such liens in the courts of the United States.

No question has been raised as to the validity of the mortgages as such. The only defense to the libels is that the mortgages gave rise to no maritime lien, are entitled to no status as preferred mortgages, and cannot be enforced in a court of admiralty. I have attempted to show why this is not so. In my opinion, the decrees ordering sales for the satisfaction of the liens of the mortgages should be affirmed.