## NORTH PACIFIC STEAMSHIP COMPANY *v.* HALL BROTHERS MARINE RAILWAY & SHIPBUILDING COMPANY.

### APPEAL FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF CALIFORNIA.

No. 53.  Argued November 18, 19, 1918.—Decided March 3, 1919.

A contract for maritime service is within the admiralty jurisdiction, although not to be executed upon navigable waters.  P. 125.

The place of performance—i. e., whether upon navigable waters or elsewhere—is but an evidentiary circumstance, to be considered in determining whether the contract is by nature maritime.  *Id.*

A materialman furnishing supplies or repairs may proceed against the ship *in rem*, or against the master or owner *in personam*.  12th Admiralty Rule.  P. 126.

While a contract for building a ship or supplying materials for her construction is not maritime, a contract for services, materials, and use of facilities, for the repair of a vessel already launched and devoted to maritime use, is a maritime contract; and in this respect it is immaterial whether the repairs are made while she is afloat, in dry dock or hauled out upon the land.  P. 126.  *The Robert W. Parsons,* 191 U. S. 17, limited.

The fact that the repairs are made under superintendence of the ship-
owner does not destroy the maritime nature of such a contract.
P. 129.

For the purpose of repairing a vessel for a voyage, the owner of a ship-
yard, marine railway and machine shops, agreed to furnish materials
and men to work under supervision of the shipowner, and to tow
the vessel in and haul her out upon the land next the shops, as re-
quired in the repairs, by means of the railway, stated prices being
exacted for labor, use of tug and scow, hauling out, use of railway,
materials, etc. *Held*, an entire marine contract, for the repair of
the vessel, not involving a lease, or agreement in the nature of a
· lease, of the railway and machine shops, the use of these being but
incidental. P. 128.

Affirmed.

· THE case is stated in the opinion.

*Mr. Jackson H. Ralston*, with whom *Mr. Frank W.
Aitken*, *Mr. H. W. Glensor* and *Mr. Ernest Clewe* were on
the brief, for appellant:

The contract involved in this case did not call for the
performance by libelant of any service on or for a ship,
either on water or land, but merely for the supply of a
marine railway shipyard and equipment. Appellant did
not bargain for making repairs or for the results of the
use of the equipment, labor and materials supplied by
libelant, but for the use thereof by itself. The testimony
of the parties forecloses any other construction. Such a
contract does not relate to "navigation, business or com-
merce of the sea."

The subject-matter of a contract is the test for determin-
ing whether or not admiralty has jurisdiction. Subject-
matter must not be confused with the object of a contract,.
*Leland* v. *Ship Medora*, 15 Fed. Cas. No. 8237; *The Paola
R*, 32 Fed. Rep. 174; *De Lovio* v. *Boit*, 7 Fed. Cas. No.
3776; *Insurance Co.* v. *Dunham*, 11 Wall. 1, 26; *The Eclipse*,
135 U. S. 599, 608; *Atlantic Transport Co.* v. *Imbrovek*,
234 U. S. 52; nor must the old single test of location be
entirely disregarded, *The Robert W. Parsons*, 191 U. S. 17;

*Ransom* v. *Mayo*, Fed. Cas. Nos. 11571, 11571A; *Bradley* v. *Bolles*, Fed. Cas. No. 1773; *Pritchard* v. *Lady Horatia*, Fed. Cas. No. 11438; *Boon* v. *The Hornet*, Fed. Cas. No. 1640. *Wortman* v. *Griffith*, Fed. Cas. No. 18057, and *The Vidal Sala*, 12 Fed. Rep. 207, distinguished.

Under the subject-matter test as so limited, admiralty has no jurisdiction of the present case for two reasons, first, because the repairs to the vessel were made wholly upon land in a shipyard in no sense a part of the sea, and second, because the repairs were made solely by appellant, the libelant only furnishing the plant. In other words, the claim of libelant is merely for charges for the use and occupation of its marine railway and shipyard, a subject which under the decision in the *The Robert W. Parsons*, is not within the admiralty jurisdiction. See also *Berton* v. *Dry Dock Co.*, 219 Fed. Rep. 763, 769. For admiralty jurisdiction the contract must be maritime as a whole; and, even if this were not so, the contract here could not be severed, inasmuch as the libel was brought on the contract as an entirety. Furthermore, if there could be any such segregation of items, there would be no jurisdiction in admiralty inasmuch as the only items in dispute—for overtime rent—are not maritime at all. To give admiralty jurisdiction, the contract must be maritime in all its elements. *Plummer* v. *Webb*, Fed. Cas. No. 11233; *The Vidal Sala*, 12 Fed. Rep. 207, 208.

The Act of Congress of 1910 does not purport to give jurisdiction in this case. If such were its purpose the attempt would be nugatory. *The St. Lawrence*, 1 Black, 522; *The Lottawanna*, 21 Wall. 558, 575; *The Sinaloa*, 209 Fed. Rep. 287, 288.

An extension of admiralty jurisdiction to cases like this would constitute an unwarranted invasion of the field of ordinary contracts and result in a denial to litigants of the right of trial by jury and other incidents of common-law procedure which are jealously guarded by

the Federal Constitution and the constitutions of the several States.

*Mr. Warren Gregory* and *Mr. Allen L. Chickering*, for appellee, submitted.

MR. JUSTICE PITNEY delivered the opinion of the court.

This is a direct appeal under § 238, Judicial Code (Act of March 3, 1911, c. 231, 36 Stat. 1087, 1157), involving only the question whether the cause was within the admiralty jurisdiction of a District Court of the United States.

Both parties are corporations of the State of California. Appellee, which for convenience may be referred to as the "Shipbuilding Company," filed its libel *in personam* against appellant, which we may call the "Steamship Company," to recover a balance claimed to be due for certain work and labor done, services rendered, and materials furnished in and about the repairing of the steamship *Yucatan*. The Steamship Company filed an answer denying material averments of the libel, and a cross-libel setting up a claim for damages for delay in the making of the repairs. The cause having been heard upon the pleadings and proofs, there was a decree for a recovery in favor of the Shipbuilding Company and a dismissal of the cross-libel. After this the Steamship Company filed a motion to arrest and vacate the decree and to dismiss the cause for want of jurisdiction. The motion was submitted to the court upon the pleadings, the proofs taken upon the hearings of the merits, and some slight additional proof. It was denied, and the present appeal followed.

The facts were these: In the month of May, 1911, the Steamship Company was the owner of the American steamer *Yucatan*, which then lay moored or tied up at

dock upon the waters of Puget Sound at Seattle, in the
State of Washington. The vessel, which was of steel
construction, was in need of extensive repairs. She had
been wrecked, and had remained submerged for a long
time; ice floes had torn away the upper decks, and some of
her bottom plates also needed to be replaced. She was
under charter for an Alaskan voyage, to be commenced
as soon as the repairs could be completed. The Ship-
building Company was the owner of a shipyard, marine
railway, machine shops, and other equipment for building
and repairing ships, situate upon and adjacent to the
navigable waters of Puget Sound at Winslow, in the same
State, and had in its employ numerous mechanics and
laborers. Under these circumstances it was agreed be-
tween the parties that the Shipbuilding Company should
tow the vessel from where she lay to the shipyard, haul
her out as required upon the marine railway to a position
on dry land adjacent to the machine shop—the place
being known as the "dry dock," and the hauling out being
described as "docking"—and should furnish mechanics,
laborers, and foremen as needed, who were to work with
other men already in the employ of the Steamship Com-
pany, and under its superintendence; and the Shipbuilding
Company was also to furnish plates and other materials
needed in the repairs, and the use of air compressors,
steam hammers, riveters, boring machines, lathes, black-
smith forge, and the usual and necessary tools for the use
of such machines. At the time the contract was made,
another vessel (the *Archer*) was upon the dry dock, and
it was uncertain how soon she could be returned to the
water. It was understood that the *Yucatan* should be
hauled out as soon as the *Archer* came off, should remain
upon the dry dock only during such part of the work as
required her to be in that position, and at other times
should lie in the water alongside the plant. For the serv-
ices to be performed and the materials and equipment

to be furnished the Shipbuilding Company was to receive stated prices, thus: for labor of all classes, the actual rate of wages paid to the men plus 15 per cent.; for use of tug and scow, a stated sum per hour; for hauling out the vessel and·the use of the marine railway, a stated sum for the first 24 hours, and a specified rate per day for 6 "lay days" immediately following the hauling out; for each working day thereafter, another rate; for vessel lying alongside the dock for repairs, no charge; for the running of air compressors, a certain charge per hour; for the use and operation of other machines, certain rates specified; and for materials supplied, invoice prices and cost of freight to plant, with 10 per cent. additional.

The vessel was docked and repaired in the manner contemplated by the agreement; she was brought to the shipyard on the 27th of May, and lay in the water alongside of the dock there until the 17th of June, during which time upper decks and beams were put in and other work of a character that could be done as well while she was afloat as in the dry dock. On June 17 she was hauled out and remained in dry dock for about two weeks while her bottom plates were renewed. During the same period the propeller was removed to permit of an examination of the tail shaft, and as the shaft showed deterioration a new one was ordered to be supplied by a concern in San Francisco. Upon completion of the work upon the bottom plates, and on the 5th of July, the vessel was returned to the water and lay there for about two weeks awaiting arrival of the new tail shaft. When this arrived the vessel was again hauled out, the tail shaft and propeller were fitted, and the remaining repairs completed. Libelant's claim was for work and labor performed, services rendered, and materials furnished under the circumstances mentioned, and was based upon the agreed scale of compensation.

The question in dispute is whether a claim thus grounded

is the subject of admiralty jurisdiction; appellant's contention being that the contract, or at least an essential part of it, was for the use by appellant of libelant's marine railway, shipyard, equipment, and laborers in such manner as appellant might choose to employ them, and that it called for the performance of no maritime service by libelant.

The Constitution, Art. III, § 2, extends the judicial power of the United States to "all cases of admiralty and maritime jurisdiction"; and the legislation enacted by Congress for carrying the power into execution has been equally extensive. Act of September 24, 1789, c. 20, § 9, 1 Stat. 73, 77; Rev. Stats., § 563 (8); Judicial Code, § 24 (3), 36 Stat. 1087, 1091, c. 231.    In defining the bounds of the civil jurisdiction, this court from an early day has rejected those trammels that arose from the restrictive statutes and judicial prohibitions of England. *Waring* v. *Clarke,*   5 How. 441, 457–459; *Insurance Co.* v. *Dunham,* 11 Wall. 1, 24; *The Lottawanna,* 21 Wall. 558, 576.

It must be taken to be the settled law of this court that while the civil jurisdiction of the admiralty in matters of tort depends upon locality—whether the act was committed upon navigable waters—in matter of contract it depends upon the subject-matter—the nature and character of the contract; and that the English rule, which conceded jurisdiction, with a few exceptions, only to contracts made and to be executed upon the navigable waters, is inadmissible, the true criterion being the nature of the contract, as to whether it have reference to maritime service or maritime transactions. *People's Ferry Co.* v. *Beers,* 20 How. 393, 401; *Philadelphia, Wilmington & Baltimore R. R. Co.* v. *Philadelphia, &c. Steam Towboat Co.,* 23 How. 209, 215; *Insurance Co.* v. *Dunham,* 11 Wall. 1, 26; *The Eclipse,* 135 U. S. 599, 608.

In some of the earlier cases the influence of the English

rule may be discerned, in that the question whether a contract was to be performed upon the navigable waters was referred to as pertinent to the question whether the contract was of a maritime nature (*The Thomas Jefferson,* 10 Wheat. 428, 429; *The Planter [Peyroux v. Howard],* 7 Pet. 324, 341; *Steamboat Orleans v. Phœbus,* 11 Pet. 175, 183; *New Jersey Steam Navigation Co. v. Merchants' Bank,* 6 How. 344, 392); but a careful examination of the opinions shows that the place of performance was dealt with as an evidential circumstance bearing with more or less weight upon the fundamental question of the nature of the contract. If they go beyond this, they must be deemed to be overruled by *Insurance Co. v. Dunham, supra.*

Neither in jurisdiction nor in the method of procedure are our admiralty courts dependent alone upon the theory of implied hypothecation; it being established that in a civil cause of maritime origin involving a personal responsibility the libelant may proceed *in personam* if the respondent is within reach of process. *The General Smith,* 4 Wheat. 438, 443; *Manro v. Almeida,* 10 Wheat. 473, 486; *New Jersey Steam Navigation Co. v. Merchants' Bank,* 6 How. 344, 390; *Morewood v. Enequist,* 23 How. 491; *The Belfast,* 7 Wall. 624, 644; *The Kalorama,* 10 Wall. 204, 210; *The Sabine,* 101 U. S. 384, 386; *In re Louisville Underwriters,* 134 U. S. 488, 490; *Workman v. New York City,* 179 U. S. 552, 573; *Ex parte Indiana Transportation Co.,* 244 U. S. 456.

That a materialman furnishing supplies or repairs may proceed in admiralty either against the ship *in rem* or against the master or owner *in personam* is recognized by the 12th Rule in Admiralty, adopted in its present form in the year 1872 (13 Wall. xiv) after a long controversy that began with *The General Smith,* 4 Wheat. 438, and ended with *The Lottawanna,* 21 Wall. 558, 579, 581. See *The Glide,* 167 U. S. 606.

It is settled that a contract for building a ship or supply-

ing materials for her construction is not a maritime contract. *People's Ferry Co.* v. *Beers*, 20 How. 393; *Roach* v. *Chapman*, 22 How. 129; *Edwards* v. *Elliott*, 21 Wall. 532, 553, 557; *The Winnebago*, 205 U. S. 354, 363. In the case in 20 Howard the court said (p. 402): "So far from the contract being purely maritime, and touching rights and duties appertaining to navigation (on the ocean or elsewhere), it was a contract made on land, to be performed on land." But the true basis for the distinction between the construction and the repair of a ship, for purposes of the admiralty jurisdiction, is to be found in the fact that the structure does not become a ship, in the legal sense, until it is completed and launched. "A ship is born when she is launched, and lives so long as her identity is preserved. Prior to her launching she is a mere congeries of wood and iron—an ordinary piece of personal property—as distinctly a land structure as a house, and subject to mechanics' liens created by state law enforcible in the state courts. In the baptism of launching she receives her name, and from the moment her keel touches the water she is transformed, and becomes a subject of admiralty jurisdiction." *Tucker* v. *Alexandroff*, 183 U. S. 424, 438.

In *The Robert W. Parsons*, 191 U. S. 17, 33, 34, it was held that the admiralty jurisdiction extended to an action for repairs put upon a vessel while in dry dock; but the question whether this would apply to a vessel hauled up on land for repairs was reserved, the language of the court, by Mr. Justice Brown, being: "Had the vessel been hauled up by ways upon the land and there repaired, a different question might have been presented, as to which we express no opinion; but as all serious repairs upon the hulls of vessels are made in dry dock, the proposition that such repairs are made on land would practically deprive the admiralty courts of their largest and most important jurisdiction in connection with repairs."

In *The Steamship Jefferson*, 215 U. S. 130, it was held that the admiralty jurisdiction extends to a claim for salvage service rendered to a vessel while undergoing repairs in a dry dock.

What we have said sufficiently indicates the decision that should be reached in the case at bar. The contract as made contemplated the performance of services and the furnishing of the necessary materials for the repairs of the steamship *Yucatan*. It was an entire contract, intended to take the ship as she was and to discharge her only when completely repaired and fit for the Alaskan voyage. It did not contemplate, as is contended by appellant, either a lease, or a contract for use in the nature of a lease, of the libelant's marine railway and machine shop. The use of these was but incidental; the vessel being hauled out, when consistent with the progress of other work of the Shipbuilding Company, for the purpose of exposing the ship's bottom to permit of the removal and replacement of the broken plates and the examination of the propeller and tail shaft. In *The Planter (Peyroux v. Howard)*, 7 Pet. 324, 327, 341, the vessel, requiring repairs below the water line as well as above, was to be and in fact was hauled up out of the water; and it was held that the contract for materials furnished and work performed in repairing her under these circumstances was a maritime contract. We think the same rule must be applied to the case before us; that the doubt intimated in *The Robert W. Parsons*, 191 U. S. 17, 33, 34, must be laid aside; and that there is no difference in character as to repairs made upon the hull of a vessel dependent upon whether they are made while she is afloat, while in dry dock, or while hauled up by ways upon land. The nature of the service is identical in the several cases, and the admiralty jurisdiction extends to all.

This is recognized by the Act of Congress of June 23, 1910, c. 373, 36 Stat. 604, which declares that "Any per-

son furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic," upon the order of a proper person, shall have a maritime lien upon the vessel.

The principle was recognized long ago by Mr. Justice Nelson in a case decided at the circuit, *Wortman v. Griffith* (1856), 3 Blatchf. 528, 30 Fed. Cas. No. 18,057, which was a libel *in personam* to recover compensation for services rendered in repairing a steamboat. Libelant was the owner of a shipyard with apparatus consisting of a railway cradle and other fixtures and implements used for the purpose of hauling vessels out of the water and sustaining them while being repaired. Certain rates of compensation were charged for hauling the vessel upon the ways, and a per diem charge for the time occupied while she was under repair, in cases where the owner of the yard and apparatus was not employed to do the work but the repairs were made by other shipmasters, as was done in that case. The owner of the yard and apparatus, together with his employees, superintended and conducted the operation of raising and lowering the vessel and also of fixing her upon the ways preparatory to the repairs, a service requiring skill and experience and essential to the process of repair. Mr. Justice Nelson held there was no substantial distinction between such a case and the case where the shipmaster was employed to make the repairs; and that the admiralty jurisdiction must be sustained.

Nor is the present case to be distinguished upon the ground that the repairs in which libelant was to furnish work and materials and the use of a marine railway and other equipment were to be done under the superintendence of the Steamship Company. This affected the quantum of the services and the extent of the responsibility, but not the essential character of the services or the nature of the contract, which, in our opinion, were maritime.

*Decree affirmed.*