**NATIONAL MARINE SERVICE, INC.,**
Plaintiff,

v.

**C. J. THIBODEAUX AND COMPANY,**
Individually and as a partner of the
Prairie Company, et al., Defendants.

Civ. A. No. 71–H–907.

United States District Court,
S. D. Texas,
Houston Division.

Sept. 24, 1973.

Larry Knippa, Houston, Tex., for plaintiff.

Schirmeyer & Kratochvil, L. Glen Kratochvil, Houston, Tex., for defendants.

## MEMORANDUM AND ORDER:

SEALS, District Judge.

This is a suit to collect the value of services rendered in the repair of a vessel in the sum of $18,683.76. Jurisdiction of this Court is based on 28 U.S.C. §§ 1332 and 1333. The Plaintiff, National Marine Services, Inc., is a Delaware corporation with its principal place of business in Saint Louis, Missouri. It operates a shipyard in Hartford, Illinois, where the repairs here at issue were performed on the vessel GRAND LAKE between December, 1969 and February, 1970. The Defendants are C. J. Thibodeaux and Company, a Texas corporation, and two individuals, D. J. Glenney III and J. Franklin Morris, and the Prairie Company, a partnership composed of the above named Defendants.[1] The Prairie Company was the owner of the vessel GRAND LAKE at the time the repairs were made. The parties have stipulated the reasonable value of the repairs to be $18,683.76.

The GRAND LAKE was chartered by Prairie Company to River Gulf Corporation, a Texas corporation owned and run by Fred Thompson, an employee of C. J. Thibodeaux and Company. River Gulf had no offices of its own. Thompson conducted its business from his desk in Thibodeaux's brokerage house. The GRAND LAKE charter contained a prohibition against liens clause. A notice posted in the wheelhouse of the vessel identified Prairie Company as the owner, River Gulf as the charterer, and stated that, under the terms of the charter, River Gulf was not empowered to incur liens upon the vessel except for crew's wages and salvage. Prairie Company at all relevant times was listed as the owner of the GRAND LAKE in "Merchant Vessels of the United States." National Marine Service repaired and released the vessel without examining the charter, inspecting the wheelhouse, observing the notice, or contacting the owner in any way.[2]

Upon the passage of a hundred days without being paid, National Marine contacted River Gulf and its President, Fred Thompson. Thompson said that River Gulf was seeking insurance coverage on the crankshaft repairs and would pay as soon as the insurance claim was paid. He asked National Marine to write a letter to the carrier concerning the claim, which it did; but no reply was ever received. National Marine then resorted to judicial process, filing a suit against River Gulf in the state courts in Houston on November 3, 1970, and a libel against the vessel in federal court in New Orleans on February 17, 1971.[3] The federal suit was instituted too late as the GRAND LAKE had burned, and sunk in April of 1970. In the state suit a default judgment was

1. Upon a motion by Plaintiff, National Marine Service, Inc., the suit against Defendant Frederick Thompson was dismissed.

2. The failure of Plaintiff to examine the wheelhouse might well have precluded the assertion of a lien against the vessel, were she still in existence, under 46 U.S.C. § 973, but, it does not prevent a suit *in personam* against those under a legal obligation to pay for the repairs.

3. National Marine Service v. M/V GRAND LAKE, Civil Action No. 71–465, United States District Court, Eastern District of Louisiana, New Orleans Division.

rendered against River Gulf on January 4, 1971.[4]

Finding that River Gulf was judgment proof, National Marine filed the present action on August 18, 1971. National Marine now alleges *inter alia* that River Gulf was a corporate shell and an alter ego of Prairie Company; that the bareboat charter was a fiction; and that the repairs of the GRAND LAKE, done at River Gulf's behest, were performed for the benefit of Prairie Company with its actual or constructive knowledge.

The evidence supports the Plaintiff's contentions. C. J. Thibodeaux and Company is a marine charter brokerage house and shipping agent. Wishing to engage in the ownership and operation of vessels and barges, but unwilling to compete directly with its clients or use a name with an established brokering reputation, Thibodeaux formed a subsidiary corporation, Prairie Corporation, to handle such business.

The Prairie Corporation purchased the GRAND LAKE. Then in September of 1967, Thibodeaux liquidated its subsidiary corporation, but continued the operations through the Prairie Company partnership which it established with Morris and Glenney.[5] James Chadwick served as the President of both D. J. Thibodeaux and Company and Prairie Company. The partnership between C. J. Thibodeaux and Company and Morris and Glenney dissolved in December, 1970, as part of the dissolution the assets of Prairie Company were distributed and it ceased business in May, 1971. The Prairie Company partnership existed from at least January 1, 1968 to December 31, 1970, which encompasses all of the time relevant to this lawsuit. The "Prairie Company" entity owned the GRAND LAKE. In January, 1968, the GRAND LAKE and four barges chartered by C. J. Thibodeaux and Company, with an option to purchase, were chartered to Coastal Barge Lines of New Orleans.[6] Coastal Barge operated the tows as a unit, but failed to pay its charter hire. In January, 1969 Thibodeaux retrieved the tow when Coastal owed $120,000 in charter hire.

In the meantime, Fred Thompson, a Thibodeaux employee, had formed River Gulf Corporation in May of 1968 for the express purpose of operating vessels to carry marine freight.[7] River Gulf did not begin operations immediately; but in January, 1969 Thompson capitalized it with the minimum $1,000 and commenced operations. In January Thompson and Chadwick were discussing the GRAND LAKE, and according to Chadwick, Thompson said that he could handle the GRAND LAKE through River Gulf and have Mark Shurden operate it. Chadwick readily agreed and turned the vessel, worth $110,000 and the four barges, worth $181,000 over to his employee's corporation without ever investigating the corporation or its assets. Chadwick prepared a bareboat charter between Prairie Company and River Gulf, but it was never presented for signature. The charter expired by its own terms in six months, but it was never renewed and no new charter was ever executed. Thompson then contracted with Shurden to operate the GRAND LAKE and her tow. Shurden hired the crew and paid wages. Thompson directed River Gulf's operations, i. e., the

---

4. National Marine Service v. River Gulf Corp., No. 851,894 80th District Court, Harris County, Texas.

5. "Prairie Company" was actually an assumed name of the partnership of Thibodeaux Company, Morris and Glenney.

6. Previously the barges had been leased to another Thibodeaux subsidiary, Texcal, which subleased them to Magnolia Marine Co. of Greenville, Mississippi, a company run by Mark Shurden. Shurden turns up later as the master of the GRAND LAKE. He and Chadwick, Thibodeaux's President, had known each other for years.

7. Thompson had been with Thibodeaux once before, but had left them to become President of Coyle Lines in New Orleans. While in that position he sold the M/V HOUSTON to Prairie Corporation. The vessel was renamed the GRAND LAKE and when Coyle Lines folded, Thompson returned to Thibodeaux.

GRAND LAKE and her tow, from his office at C. J. Thibodeaux and Company. In April of 1969, River Gulf engaged to purchase the four barges from Crekow Towing taking up Thibodeaux's option. River Gulf executed a promissory note for $181,623.56 in favor of Crekow. Acting for Prairie Company, Chadwick orally guaranteed the note to Crekow. By June, River Gulf owed Prairie Company $40,000 in charter hire. At that time, River Gulf purchased another vessel M/V JACK T. In November, 1970, the JACK T was seized for seaman's wages and eventually sold at auction. River Gulf ceased operations.

■ The relationship between River Gulf and Prairie Company cannot be regarded as arm's length. Valuable property was turned over to River Gulf on no other basis than Chadwick's professed confidence in Thompson. The charter was never executed. Prairie Company gratuitously guaranteed River Gulf's promissory note to Crekow. Thompson ran River Gulf's operations out of C. J. Thibodeaux and Company. Chadwick's testimony that he did not discuss the purchase of the JACK T with Thompson when River Gulf's operations were beginning to flounder is not credible. Chadwick's education, experience, demeanor and response to questions indicate that he is an astute businessman. Such a man would exercise more care than that to which Chadwick was willing to testify. C. J Thibodeaux and Company wanted to own and operate vessels without appearing to do so. Its employee's corporation gave them a ready-made conduit to do so from their own offices. The testimony that Chadwick and Thompson did not discuss the repairs to the GRAND LAKE during and after the time in which they were performed is not credible. It was River Gulf's main asset and upon its wellbeing the profits of River Gulf, Prairie Company and ultimately C. J. Thibodeaux and Company depended. Thompson after all was an employee of Thibodeaux, one of the partners in the vessel owner. It would be highly unusual for him to neglect to mention that the GRAND LAKE needed a new crankshaft. He knew the situation and therefore, C. J. Thibodeaux and Company and Prairie Company knew or should have known that the vessel had been damaged and was being repaired. While never intended to be such River Gulf became an operating arm of Prairie Company and C. J. Thibodeaux and Company. Upon these facts, it appears to this Court that River Gulf was a mere alter ego of Prairie Company; that the bareboat charter was a fiction; and that the repairs were performed for the benefit of Prairie Company with its actual or constructive knowledge.

The Defendants have raised the judgment in the state court as a bar to the present action under the various doctrines of res judicata, collateral estoppel, the splitting of a cause of action and election. In sum, the Defendants argue that National Marine has elected to pursue River Gulf in state court and cannot now bring a second action on the same contract against new Defendants under an alter ego, or quasi-contractual theory.

■ This Court is of the opinion that the state court judgment does not preclude the maintenance of the present action. As a general rule the rendition of a judgment in an action against one of two or more persons under an obligation to pay for services rendered does not affect the claim against the other. If, as National Marine contends, River Gulf was the alter ego of Prairie Company both entities would be liable for the repairs performed upon the GRAND LAKE, thus apparently bringing this case squarely within the above rule.[8]

■ The only exception to the general rule, material for purposes of this case, is the doctrine of agency law which, in certain cases, bars a subsequent action against a principal after a

8. Restatement of Judgments § 94 (1942).

final judgment has been obtained against his agent. According to this doctrine an undisclosed principal is discharged from liability upon a contract if, with knowledge of the existence of the principal, a final judgment on the contract is recovered against the agent.[9]

Defendants are apparently arguing that this doctrine or its functional equivalent should apply in the alter ego context. The analogy has some appeal. Courts and commentators have repeatedly, in attempting to describe the alter ego concept, made use of the terms agent or agency.[10] It would seem that the rationale underlying the election rule of agency law, prevention of a needless multiplicity of suits, applies with equal force to alter ego situations.

■ It is not necessary, however, to determine whether Plaintiff could maintain this suit if he had known of the complex interrelationship between River Gulf and Prairie Company at the time the state action reached a final judgment. There is nothing in the record to indicate that National Marine was even remotely aware of what had transpired between River Gulf and Prairie Company until after an attempt had been made to collect the judgment against River Gulf. Absent any showing that National Marine knew or had reason to know that River Gulf was a dummy corporation when the default judgment was rendered, this Court is hesitant to hold that the failure to join Prairie Company as a defendant in the state court was a fatal error.

■ The Defendants further submit that these facts are insufficient as a matter of state law to support recovery under an alter ego theory. This issue will not be reached, however, since this present case is governed by maritime as opposed to state law. The underlying

obligation upon which Plaintiff's theory of recovery is based is a contract for the repair of a vessel. Such contracts have long been within the jurisdiction of admiralty courts. North Pacific S. S. Co. v. Hall Bros. Marine Railway & Shipbuilding Co., 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919). So long as the underlying obligation arises out of a maritime contract, admiralty is not deprived of jurisdiction merely because an equitable remedy is utilized. Archawski v. Hanioti, 350 U.S. 532, 76 S.Ct. 617, 100 L.Ed. 676 (1956). "Equity is no stranger in admiralty; admiralty courts are, indeed, authorized to grant equitable relief." Vaughan v. Atkinson, 369 U.S. 527, 530, 82 S.Ct. 997, 999, 8 L.Ed.2d 88 (1962).

■ Cognizant of the principle that corporate entities should not be lightly disregarded, the Court is convinced that such action is warranted on the facts of this case in order to prevent a substantial injustice. The vessel owner was the real beneficiary of the Plaintiff's acts. From the credible evidence and the logical inferences which can be reasonably drawn from that evidence, both direct and circumstantial, the Court specifically finds not only that Prairie Company should have known of the services being performed and the corresponding obligation owed, but that it did in fact know. Defendants' use of a paper corporation to accomplish a purpose they were unwilling to do openly, with the acknowledged need to keep the vessel in commerce, allows the Court to say that the Defendants are liable to the Plaintiff for $18,683.76 for the repairs performed upon the GRAND LAKE. Plaintiff is awarded pre-judgment interest at the rate of six percent per annum from the 4th day of January, 1971. All costs are assessed against the Defendants.

9. Restatement (second) of Agency, § 210 (1957).

10. See Ballantine, Separate Entity of Parent and Subsidiary Corporations, 14 Calif.L.Rev. 12.