594 F.2d 763
 26 UCC Rep.Serv. 391
 POINT ADAMS PACKING CO., an Oregon Corporation et al.,
Plaintiffs-Appellants,
v.
ASTORIA MARINE CONSTRUCTION CO., an Oregon Corporation, The
Bender Welding and Machine Co., Inc., an Alabama
Corporation, Defendants-Appellees.
 No. 77-2621.
 United States Court of Appeals,
Ninth Circuit.
 April 4, 1979.
 
 Gerald W. Gelfand (argued), of Foulds, Felker, Gelfand & Hodges, Seattle, Wash., for plaintiffs-appellants.
 Kenneth E. Roberts of Souther, Spaulding, Kinsey, Williamson & Schwabe, Paul N. Daigle (argued), John R. Brooke, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendants-appellees.
 Appeal from the United States District Court for the District of Oregon.
 Before GOODWIN and ANDERSON, Circuit Judges, and JAMESON,* District Judge.
 J. BLAINE ANDERSON, Circuit Judge:
 
 PROCEEDINGS BELOW
 
 1
 Point Adams Packing Co. (Point Adams) and its hull underwriters brought this action against Astoria Marine Construction Co. (Astoria Marine) and The Bender Welding and Machine Co., Inc. (Bender) as a result of the sinking and loss of the crab fishing vessel, Scottie, owned by Point Adams. Jurisdiction of the district court was based on 28 U.S.C. §§ 1332, 1333. After trial to the court, the district judge entered judgment ordering that the plaintiffs recover nothing and dismissing the action against the defendants.
 
 
 2
 Point Adams appeals, claiming that the court below erred in its conclusions on the breach of warranty claim against Bender and the negligence claim against Astoria Marine. Jurisdiction of this court is proper pursuant to 28 U.S.C. § 1291. We find no error and affirm.
 
 FACTS
 
 3
 The Scottie was a ninety-foot crab fishing vessel owned by Point Adams. It was built by Bender and delivered to Point Adams in 1969. The Scottie was used in the Alaskan fishing waters from 1970 until it sank in September of 1973. The sinking was caused by flooding in the craft's lazarette[1] and engine room. Water initially entered the lazarette from an unknown cause and passed through an eight-inch pipe into the engine compartment.
 
 
 4
 The Scottie, and its sister vessel, the Stevie, were built by Bender for Point Adams in 1969. By a letter agreement, the Point Adams-Bender construction contract was modified to include language which provided that the vessels would be built to the best commercial marine practice. Point Adams claims that this established an express warranty and that pursuant to the express warranty, Bender should have installed a high-water alarm in the lazarette. This alarm would have provided an early warning that water had entered the lazarette.
 
 
 5
 In April of 1973, the Scottie was taken to Astoria Marine's shipyards. Point Adams instructed Astoria Marine to install an eight-inch pipe from the lazarette to the engine room. The pipe was installed in order to house the hydraulic lines which ran from the engine room to the lazarette and which passed through the vessel's crab tanks. Point Adams claims that had this pipe been closed or capped, then the water would not have passed through from the lazarette into the engine room.
 
 DISCUSSION
 Bender's Liability
 
 6
 For purposes of this decision, we assume that the best commercial marine practice language, included in the construction contract, created an express warranty which would have necessitated the installation of a high-water alarm in the lazarette.
 
 
 7
 It is a well-settled rule that a contract to build a ship is not governed by admiralty law concepts. People's Ferry Co. v. Beers, 20 How. 393, 61 U.S. 393, 401-402, 15 L.Ed. 961 (1858); Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); and See 1 Benedict on Admiralty (7th ed., 1974), § 188. The district court decided that Alabama law controlled Point Adams' claim arising from the breach of the express warranty in the shipbuilding contract with Bender.[2]
 
 The relevant Alabama law provided that:
 
 8
 "Where a tender has been accepted
 
 
 9
 (a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy;"
 
 
 10
 Ala.Code tit. 7A, § 2-607(3), (Uniform Commercial Code § 2-607(3)). The Alabama courts have held that this section requires a buyer to give notice of the breach of an express warranty to the seller, and have further held that the failure to give such notice bars recovery.[3] See Bennett v. United Auto Parts, Inc., 294 Ala. 300, 315 So.2d 579 (1975); Page v. Camper City & Mobile Home Sales, 292 Ala. 562, 297 So.2d 810 (1974); Redman Industries v. Binkey, 49 Ala.App. 595, 274 So.2d 621 (1973); and Cf. Smith v. Pizitz of Bessemer, Inc., 122 So.2d 591 (Ala.Sup.Ct.1960).
 
 The district court found that:
 
 11
 ". . . no notice was ever given to Bender of a breach of warranty . . . if the failure to install a lazarette alarm was considered by plaintiff to be a breach of contract, any reasonable inspection would have disclosed its absence. Whatever a reasonable time for discovery might be, it had certainly expired long before this loss, which occurred three and one-half years after delivery."[4]
 
 
 12
 Clerk's Record (C.R.) 380.
 
 
 13
 In view of these findings and the controlling Alabama law, we believe that the district court was correct in its conclusion that Point Adams' failure to give the required notice barred its claim for breach of express warranty.[5]
 
 ASTORIA MARINE'S LIABILITY
 
 14
 Contracts for the repair of ships are governed by admiralty law.[6] New Bedford Dry Dock Co. v. Purdy, 258 U.S. 96, 99, 42 S.Ct. 243, 66 L.Ed. 482 (1922); 1 Benedict on Admiralty (7th ed., 1974), § 189. Point Adams claims that Astoria Marine, having repaired the Scottie by installing the conduit pipe, neither fulfilled its warranty of workmanlike service, nor satisfied its duty to warn Point Adams of the potential danger of the open conduit.
 
 
 15
 We agree with the district court that Point Adams did not state any grounds by which liability could be established against Astoria Marine. In his opinion, Judge Burns made the following factual findings and drew the following conclusions, which we adopt as part of our opinion:
 
 
 16
 "There was differing testimony concerning the wisdom of breaching the watertight integrity of a vessel by installing an open conduit in the manner employed here. Mr. Schubert testified that having an open conduit would not be a good practice. Capt. Hansen (of the Scottie) said he was aware the pipe was open, but felt that this would not be a cause for concern under normal circumstances, because it was so high up in the lazarette (references omitted).
 
 
 17
 "The weight of the evidence, however, supports the conclusion that it would not be unreasonable or show a lack of due care for a marine repair yard to follow specific directions given it by a vessel's owner, in installing such a conduit. This is especially true here because plaintiff, a large fishing concern, was far more knowledgeable than Astoria about actual fishing conditions in the North Pacific area. Astoria Marine did not hold itself or its employees out as naval architects or as marine engineers. There is no contention that, assuming installation of the open conduit was reasonable, that the actual installation was done improperly or negligently.
 
 
 18
 "Plaintiff's knowledge of the alternatives available for installation of a conduit also mitigates (sic) against liability on the part of Astoria.
 
 
 19
 "At about the same time that the Scottie was at the Astoria yard, her sister ship, the Stevie, was being repaired at Duwamish Shipyard in Seattle, Washington. By letter of April 5, 1973, Duwamish furnished an estimate to Mr. Anderson, of plaintiff, which included a similar conduit from the lazarette to the engine room. This pipe, however, was to be capped on both ends. (footnote omitted)"Arthur Yri, the Stevie's captain, testified that he discussed the installation of the conduit with Duwamish's representative at great length and that he insisted the pipe be capped for watertightness. He stated that he discussed all the repairs with his boss, Jerry Anderson, and that Anderson approved and authorized all the work. One of the reasons for installation of the pipe in the Scottie was to allow warm air to flow to the engine room to help dry out the damp lazarette. This clearly could not have been accomplished if the conduit was sealed on both ends. This was not a consideration in the Stevie because, as Capt. Yri testified, the Stevie's lazarette was equipped with a heat lamp for this purpose.
 
 
 20
 "Thus the person in charge of both repair jobs, Jerry Anderson, plaintiff's manager, must have been aware that the installation of the conduit in the Scottie was being handled differently from that on the Stevie. He was also aware there were alternative methods available for installing the pipe and drying out the lazarette. Nevertheless he instructed Astoria to install the conduit. I find, therefore, that Astoria was not negligent in following Point Adams' instructions by installing an open conduit from the lazarette to the engine room of the Scottie.
 
 
 21
 "I also find, based on the above, that defendant Astoria had no duty to warn plaintiff of the possible dangers which an open conduit might present. Plaintiff was a knowledgeable crab boat owner and operator and was aware of the fact that either an open or a closed conduit could be installed. Any risk was as obvious, if not more so, to plaintiff than to Astoria. Plaintiff had superior knowledge of the conditions encountered in its fishing operations. (citation omitted)"
 
 
 22
 C.R. 381-382A.
 
 
 23
 Point Adams fails to show that the district court applied the wrong legal standard. The cases which Point Adams relies upon do not mandate a different result.[7] Furthermore, the factual findings and conclusions of the district court were supported by substantial evidence.[8]
 
 
 24
 The judgment of the district court is AFFIRMED.
 
 
 
 *
 The Honorable William J. Jameson, Senior United States District Judge for the District of Montana, sitting by designation
 
 
 [1]
 As used in this case, lazarette refers to a space at the vessel's stern, below deck, which was used for storage and which contained part of the steering mechanism
 
 
 [2]
 Point Adams does not argue that its claim should be controlled by the law of any other state, but it does suggest that "admiralty breach of warranty law" should apply instead. However, this argument is based upon Sears, Roebuck and Co. v. American President Lines, Ltd., 345 F.Supp. 395 (N.D.Cal.1971) which addressed the jurisdictional question of whether a district court sitting in admiralty could recognize implied warranties, and not the choice of law question as to what law should control the express warranty claim arising from the contract to build the ship
 
 
 [3]
 The cases cited by Point Adams do not stand for the proposition that notice is not required in breach of warranty cases. See Geohagan v. General Motors Corp., 291 Ala. 167, 279 So.2d 436 (1973); Storey v. Day Heating & Air Conditioning Co., Inc., 56 Ala.App. 81, 319 So.2d 279 (1975)
 
 
 [4]
 On appeal, Point Adams argues that it is no defense to an action based on express warranty that an inspection may have revealed the defect. From this, Point Adams reasons that since there is no duty to inspect, there should be no duty to give notice. This argument is premised on this court's decision in United States v. Franklin Steel Products, Inc., 482 F.2d 400 (9th Cir. 1973), Cert. denied, 415 U.S. 918, 94 S.Ct. 1416, 39 L.Ed.2d 472, which is distinguishable for several reasons. First, the agreement in Franklin Steel provided that despite inspection and acceptance, the seller warranted that the goods would satisfy certain detailed specifications. 482 F.2d at 402, n. 1. Second, the defects which breached the warranty were latent and could not have been discovered by visual inspection. 482 F.2d at 403. The alleged defect in the present case was patent, as the district court observed, "any reasonable inspection would have disclosed its absence." C.R. 380. And third, the decision in Franklin Steel was apparently not controlled by the U.C.C. as this case is
 
 
 [5]
 Because of our finding that the failure to give notice precludes any recovery against Bender, we need not decide whether the absence of the alarm was the proximate cause, or whether Point Adams' claim was barred by the statute of limitations
 
 
 [6]
 The reason for the distinction between contracts to repair, and contracts to build ships, with only the former coming under admiralty jurisdiction, was best explained by the Supreme Court when it said:
 ". . . the true basis for the distinction between the construction and the repair of a ship, for the purposes of admiralty jurisdiction, is to be found in the fact that the structure does not become a ship, in the legal sense, until it is completed and launched."
 North Pacific Steamship Co. v. Hall Brothers Marine Railway and Shipbuilding Co., 249 U.S. 119, 127, 39 S.Ct. 221, 223, 63 L.Ed. 510 (1919).
 
 
 [7]
 In Albina Engine & Machine Wks. v. Hershey Chocolate Corp., 295 F.2d 619 (9th Cir. 1961), the repair contractor's liability resulted, in part, from its failure to comply with the standard of care imposed by a city ordinance. And, the present case is more like Campania Naviera Limitada v. Black, et al, 183 F.2d 388 (9th Cir. 1950), than the Extraordinary situation in Pan-American Petroleum Transp. Co. v. Robins Dry Dock & Repair Co., 281 F. 97 (2d Cir. 1922), Cert. denied, 259 U.S. 586, 42 S.Ct. 589, 66 L.Ed. 1076
 
 
 [8]
 The findings and conclusions are included in Judge Burns' unpublished opinion dated and entered March 24, 1977, District of Oregon, Civil No. 75-281