**PEREZ Y CIA. DE PUERTO RICO, INC., Plaintiff,**

v.

**S/V LA ESPERANZA, her engines, tackle, furniture, apparel, appurtenances, etc., in rem; La Esperanza De Puerto Rico, Inc., in personam, Defendants.**

**LA ESPERANZA DE PUERTO RICO, INC., Plaintiff,**

v.

**PEREZ Y CIA. DE P.R., INC., Defendant.**

Civ. Nos. 94–2038 (GG), 94–2041 (GG).

United States District Court, D. Puerto Rico.

Sept. 18, 1995.

Calvesbert & Brown, San Juan, PR, for Plaintiff.

Harry A. Ezratty, San Juan, PR, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

GIERBOLINI, Senior District Judge.

This consolidated admiralty action results from work performed on the passenger vessel S/V "La Esperanza" by plaintiff and crossdefendant Pérez y Cia. de Puerto Rico ("Pérez y Cia.") at its shipyard facilities beginning on March 17, 1994. Pérez y Cia. claims that it performed the work requested by La Esperanza de Puerto Rico, Inc. ("La Esperanza") in dry dock and that La Esperanza failed to pay a balance of $33,999 for work performed. Defendant and crossplaintiff La Esperanza claims that Pérez y Cia. negligently performed hull plate replacement work on the vessel, causing damage to the vessel and the failure of their San Juan Bay cruise business. For that reason, La Esperanza refused to pay the balance owed to Pérez y Cia.

1. A riveted hull is one in which the seams are

Having considered all the evidence submitted during a seven-day trial, the court makes the following:

### FINDINGS OF FACT

1. Pérez y Cia. operates a shipyard and dry dock facility in San Juan, Puerto Rico.

2. La Esperanza owns and operates the S/V "La Esperanza" ("the vessel") as a passenger vessel dedicated to navigating cruises around the San Juan Bay. La Esperanza also operates the franchise of the Café Dársenas, a small fast food outlet located in front of the vessel's docking area.

3. The vessel is a wrought iron schooner built in Belgium in 1896. The vessel has a rivetted steel hull [1], characterized as an old mixture of metals no longer used in modern ships. In 1990, the vessel was purchased by Julio R. Matos and Enrique Cardona (collectively, "Owners") for $40,000. Between 1990 and 1992, the 122-foot vessel underwent extensive reconstruction and refurbishing at the facilities of Vaello Shipyard for the purpose of converting it into a passenger vessel.

4. While at Vaello, the steel hull was tested by drilling holes into the hull to determine the thickness of the hull. Using that method, the wasted areas of the hull were identified for replacement.

5. "Wasted" or "wastage" are term used to label areas of the steel hull that have been worn out to less than 50% of their original thickness.

6. The conversion and remodeling work performed on the vessel included:

   a. stripping the vessel completely

   b. addition of conference room, VIP room, service bar and balcony

   c. construction of a wood upper deck

   d. addition of four bathrooms

   e. addition of fire fighting equipment

   f. replacement of eight wasted hull steel plates

   g. reinstallation of the mast

7. All work was overseen and approved by the U.S. Coast Guard ("Coast Guard") on a daily basis.

welded with metal bolts or rivets.

8. During the conversion period, Vaello Shipyard was responsible for developing welding procedures for Coast Guard approval.

9. Vaello Shipyard replaced several steel plates. The hull plates were cut out in V-shapes to ensure good penetration and melding of the new plates to the old steel. This method prevents cracks in the steel. New mild steel plates were used to replace wasted ones.

10. The entire conversion was completed by the Summer of 1992 was financed through loans totalling close to $2,175,000. A book value of $1,704,000 was assigned to the vessel for accounting purposes.

11. The vessel's assessed value after the conversion was as follows:

estimated value = $2.8 million

physical value = $3.5 million

replacement value = $4.8 million

12. The vessel began carrying passengers around the San Juan Bay in October, 1992. The Coast Guard permitted the vessel to carry 75 passengers. The vessel averaged two trips a day on weekdays and three to four trips on weekends. The vessel could also be rented for private events.

13. As of March 1994, after six months in operation, the vessel generated revenues of $173,000.

14. On March 4, 1994, the vessel was taken to Pérez y Cia. for rudder repair. Once there, the Owners decided to accelerate the process of obtaining a Coast Guard Certificate of Inspection while the vessel was on dry dock.

15. On March 10, 1994, following its inspection, the Coast Guard issued a Record of Deficiencies requiring that all hull plates showing over 50% wastage be replaced.

16. To identify the wasted plates, Perez y Cia. subcontracted a firm to perform audio gauging of the hull, a technique utilized to determined the thickness of hull plating. The audio gauging results showed that 80% of the hull plating had a wastage of 25% or more of its original thickness. Pursuant to those tests, the Coast Guard required that 80% of the hull be replaced. However, the Coast Guard agreed to allow the Owners to perform the hull replacement work in stages. The initial stage required that 12 hull plates be replaced.

17. On March 17, 1994, Mr. Matos signed a General Contract for Ship Repairs, accepting the estimate for repairs prepared by Miguel Nin, Pérez y Cia.'s contracting manager. The estimate quoted a total cost of $71,947.20, which included all repair work as well as docking fees. The repairs required by the Owners included: cleaning of sea valves, cleaning and painting of the sea valve thruster, replacement of zinc plates or anodes, rudder repair, renewal and installation of new hydraulic bottler, repair of propeller blade tips and replacement of 12 hull plates.

18. The Contract of Repairs between La Esperanza and Pérez y Cia. provides:

3.a) The Yard commits itself to use materials and execute work to standard ship repair practice. Bearing in mind that the work is to be performed according to the owner's instruction received either directly from the owner himself or through the received either directly from the owner himself [sic] or through the Class Surveyor, the Yard will not accept any responsibility for the performance of the repaired parts and/or equipment, unless express negligence of work execution is involved.

b) The Yard shall make good at its own workshops and expense any defective work or material supplied about which it may be informed in writhing [sic] before the yard's workmen are withdraw [sic] form [sic] the Vessel; or, at the Owner's option, it will pay a sum equal to the cost of such repair at the Yard's workshop.

4.a) The Yard shall be in no case held responsible for any indirect damages, or for damages caused by loss of time, except only as prescribed under Clause 5.

5. The yard shall cover its legal responsibility on any eventual damages caused to or by the vessels [sic] undergoing repairs by an insurance policy according in [sic] the terms of the "Ship Repairer's Liability Clause" with a qualified national insurance up to a total amount of 2 millions [sic].... The yard shall in no

case be held responsible for the damages resulting from any loss of use or profit of the vessel.

19. The Owners paid a deposit of $40,000 towards repair costs.

20. The vessel's captain, Johnny Ramírez was designated to represent the Owners at the shipyard and inform daily of the progress of the repair work.

21. Repairs began on March 17, 1994. Pérez y Cia. hired welders to do the hull plate replacement work. On March 18, 1994, the welders began cutting the La Esperanza's hull using torches. The welders did not know the type of steel used in the vessel's hull before they began cutting it.

22. On March 18, 1994, Captain Ramírez reported that the cutting and welding practices used in the hull had caused a fire and damage to the electrical system. Captain Ramírez also informed Mr. Nin of these problems.

23. The hull replacement work had to be approved by the Coast Guard. Upon inspection of the welding of the first plates, the Coast Guard disapproved of the welding procedures used by Pérez y Cia.

24. Welding procedures are the steps to be taken to complete a welding task. The procedures could be reduced to writing and may include a diagram.

25. Mr. Nin, with the aid of the welding subcontractor hired by Pérez y Cia., drafted a set of welding procedures for the Owners to present to the Coast Guard for approval. The proposed procedures were not approved.

26. The shipyard is responsible for preparing the welding procedures for Coast Guard approval because the shipyard possesses the expertise and the equipment.

27. On March 25, 1994, Pérez y Cia. removed the ship's ballast to reach the hull plates.

28. All hull replacement work stopped until new welding procedures could be devised. On April 6, 1994, Pérez y Cia. welded five temporary doubler plates onto the areas that were cut out. This welding was done too fast, using excessive heat, and without room for expansion of the metal once cooled.

This technique caused cracks in the hull and the loosening of some rivets.

29. Pérez y Cia. did not have the expertise to perform the hull replacement work on the vessel.

30. Anxious that the vessel was taking up its only dry dock facility, on May 22, 1994 Pérez y Cia. removed the vessel from the dry dock. Concrete blocks were placed on the upper wooden deck to make up for the ballast Pérez y Cia. removed during the repairs. The vessel was transported by its own power to the shipyard's tender dock area.

31. Thereafter, the Owners met with Pérez y Cia. to discuss the welding procedures. The shipyard recommended that the Owners hire Julian A. Ducat as a welding expert to devise a welding plan.

32. The Owners hired Mr. Ducat to design the welding procedures for Coast Guard approval. After reiterating his agreement to work "to obtain a Coast Guard certificate to carry passengers for hire in San Juan bay upon completion of the repairs" (Joint Ex. 9B), Mr. Ducat failed to produce a welding procedures plan.

33. Once the vessel was put back in the water, it began to take in water through cracks in the hull area. The vessel was removed from the water again and water had to be pumped out. Soft patches of rubber and metal were used to stop the leaks.

34. On May 20, 1994, Pérez y Cia. met with the Owners for the last time to discuss what would be done with the vessel in view of the problems with the welding procedures. That same day, Pérez y Cia. generated a final revised bill which accounted for the unfinished painting and hull replacement work. The final repair bill amounted to $73,999.00. Discounting the $40,000 deposit, Pérez y Cia. requested payment of the balance of $33,999.

35. La Esperanza has not paid the balance for the repairs to date.

36. On June 3, 1994, Captain Ramírez reported damage to the vessel due to sand blasting of a vessel near the La Esperanza. Sandblasting material blew all over the La

Esperanza, destroying the wood on the upper deck.

37. Surveys performed in May and June of 1994 to assess the damage described the vessel as in complete disarray. The vessel was tilted to one side. There were blocks on the upper deck in the place of the ballast that was removed. An inch of water had collected in the upper deck.

38. Other than the problems with the hull, the surveyor, Richard Brown, noted the following repairs were required: 1) repair of upper deck; 2) replacement of carpeting; 3) replacement of all wiring; and 4) replacement of some electronic equipment. He estimated all repairs would cost between $180,-000 to $220,000, not including any hidden damages.

39. After the vessel was docked in the tender dock area, Captain Ramírez reported vandalism of the vessel, including the theft of handheld radios, a welding machine and liquor. In addition, cracks developed in the soft patches.

40. The shipyard is solely responsible for doing the repairs in a satisfactory manner.

41. The vessel can be repaired to its condition when it entered the dry dock for $220,-000.

### CONCLUSIONS OF LAW

1. A shipowner may sue in either tort or contract theory for negligent repair of a vessel. *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

2. It is well settled that a contract to repair a vessel falls under the admiralty jurisdiction of the district court. *North Pacific Steamship v. Hall Brothers Marine Railway & Shipbuilding Co.*, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510 (1919); *Alcoa Steamship Co. v. Charles Ferran & Co.*, 383 F.2d 46, 49 (5th Cir.1967), *cert. denied*, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107 (1968).

3. A trial court must determine whether the shipyard deviated from the proper standard of care in its repairs of the vessel and whether such negligence was the proximate cause of the vessel's damages. *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401, 410 (5th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447, 74 L.Ed.2d 602 (1982).

4. Federal law governs the construction of terms of a contract for repair of a vessel and also the standard of performance due under the contract. *Alcoa Steamship Co.*, 383 F.2d at 49.

5. When suing under a contract theory, the condition of the vessel at the time of the negligent act is irrelevant to the question of damages where the sole cause of the damages is the negligence of the ship repair contractor. *Id.*

6. A valid contract for repairs existed between La Esperanza and Pérez y Cia.

7. It is the practice of the industry that once hired by a shipowner to perform hull repairs, the shipyard is responsible for devising a welding plan and for performing adequate hull replacement work to satisfy the Coast Guard's requirements. The shipowner is responsible for all the work done to the vessel.

8. As to the standard of care due, the contract for repairs provided in paragraph 3.a) that Pérez y Cia. committed itself to "execute work to standard ship repair practice."

9. La Esperanza complied the contract for repairs requirement that the Owners have a representative at the shipyard during the repair period by appointing Capt. Johnny Ramírez.

10. Pérez y Cia. breached the contract by deviating from the standard of care by failing to complete the work within a reasonable time and by negligently performing the hull replacement work.

11. Damages awarded for breach of contract should return the party to the position he would have occupied had the contract not been violated. *Todd Shipyards*, 674 F.2d at 414.

12. Limitation of liability clauses may be enforced by a court so long as they do not frustrate the goals of discouraging negligence by making wrongdoers pay damages or prevent those in need of goods and

services from being overreached by others who have the power to drive hard bargains. *Bisso v. Inland Waterways Corporation,* 349 U.S. 85, 91, 75 S.Ct. 629, 633, 99 L.Ed. 911 (1955); *Edward Leasing Corp. v. Uhlig & Associates, Inc.,* 785 F.2d 877, 888 (11th Cir. 1986); *M/V American Queen v. San Diego Marine Const.,* 708 F.2d 1483, 1488 (9th Cir. 1983).

13. Paragraph 4.a) of the contract for repairs contains a limitation of liability clause precluding recovery of loss of use and loss of profits in the event of a breach of contract.[2]

14. A deduction from the May 20, 1994 invoice prepared by Pérez y Cia is required by our finding that the shipyard negligently performed the hull replacement work. Thus, $23,000 will be deducted from Pérez y Cia.'s invoice.

15. Regarding Civil Case No. 94–2038, Pérez y Cia. is entitled to judgment for unpaid work performed pursuant to the contract for repairs in the amount of $10,999.00

16. As to Civil Case No. 94–2041, La Esperanza is entitled to damages to its vessel as a result of Pérez y Cia.'s negligent breach of contract in the amount of $220,000 for repairs to return the vessel to its condition before it entered the shipyard.

17. Clause 3(b) providing an opportunity for Pérez y Cia. to make good the repairs at its workshops is not be enforceable in light of our finding that Pérez y Cia does not have the expertise to perform the hull replacement work adequately.

**WHEREFORE,** in view of the above, judgment in the amount of $10,999.00 shall be entered in favor of Pérez y Cia as to Civil Case No. 94–2038 and judgment in the amount of $220,000 shall be entered in favor

of La Esperanza as to Civil Case No. 94–2041.

**SO ORDERED.**

---

2. The paragraphs specifically provide:

4.a) The Yard shall be in no case held responsible for any indirect damages, or for damages caused by loss of time, except only as prescribed under Clause 5.

5. The yard shall cover its legal responsibility on any eventual damages caused to or by the vessels [sic] undergoing repairs by an insurance policy according in [sic] the terms of the "Ship Repairer's Liability Clause" with a qualified national insurance up to a total amount of 2 millions [sic].... The yard shall in no case be held responsible for the damages resulting from any loss of us or profit of the vessel.