IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**September 13, 2007**

Charles R. Fulbruge III
Clerk

No. 05-40344

DEVON LOUISIANA CORPORATION; ET AL.,

Plaintiffs,

DEVON LOUISIANA CORPORATION,

Plaintiff-Appellee,

v.

PETRA CONSULTANTS, INC.; ET AL.,

Defendants,

MAGNOLIA INDUSTRIAL FABRICATORS, INC.,

Defendant-Appellant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

No. 05-40347

DEVON LOUISIANA CORPORATION; ET AL.,

Plaintiffs,

DEVON LOUISIANA CORPORATION,

Plaintiff-Appellee,

v.

ST. PAUL SURPLUS LINES,

Defendant-Appellant.

* * * * * * * * * * * * * *

No. 05-40350

DEVON LOUISIANA CORPORATION; ET AL.,

Plaintiffs,

DEVON LOUISIANA CORPORATION,

Plaintiff-
Third-Party Plaintiff-
Appellee,

v.

PETRA CONSULTANTS, INC.,

Defendant-
Third-Party Defendant-
Appellant.

2

Appeals from the United States District Court
for the Southern District of Texas
No. 3:04-CV-657

Before SMITH, GARZA, and OWEN, Circuit Judges.

PER CURIAM:[*]

Devon Louisiana Corporation ("Devon") seeks contractual indemnity from the defendants for costs incurred while defending a lawsuit for personal injuries sustained by a worker during repairs to Devon's offshore oil and gas platform. Defendants appeal an adverse interlocutory ruling that the contractual indemnity provision is valid and enforceable under maritime law. We affirm.

I.

Devon owns an offshore oil and gas production platform maintained and operated by independent contractors. Devon had almost identical "Master Service Agreements" ("MSA's") with Magnolia Industrial Fabricators ("Magnolia") and Petra Consultants ("Petra"). The MSA's served as blanket agreements that are not complete by themselves and called for no specific work but contemplated that "from time to time" Devon would initiate a work order requesting that Magnolia and/or Petra "perform certain work or furnish certain services." Under the MSA's, Magnolia and Petra agreed to defend and indemnify Devon against all claims arising from work performed under the MSA's, and Magnolia and Petra were required to name Devon as an "additional insured" in a compre-

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

hensive general liability ("CGL") policy.

Magnolia named Devon as an "additional insured" on a CGL policy from St. Paul Surplus Lines ("St. Paul"), and Petra did the same on a policy from The Gray Insurance Co. ("Gray"). Devon had an additional MSA with Gulf Fleet Marine ("Gulf Fleet") under which Gulf Fleet was to provide vessel support services. The Devon/Gulf Fleet MSA required Gulf Fleet to provide defense, indemnity, and insurance for incidents arising out of the MSA.

Pursuant to the MSA's, a Magnolia crew was dispatched to complete a "punch list" of repairs to Devon's platform, and a Petra employee supervised the work. Gulf Fleet did not have an available vessel to support the repair crew, so it contacted Abdon Callais Offshore, L.L.C., the owner of the M/V PETER CALLAIS, to provide vessel support services; the crew was transported to the platform aboard the PETER CALLAIS. Some of the repairs required Magnolia to use welding equipment. Because there was no "hot work" permit, those fabrication and cutting procedures could not be performed aboard the fixed platform; the welding equipment remained on the PETER CALLAIS, and the procedures were performed on the vessel.

The crew encountered inclement weather and was unable to complete all the items on the punch list. Of the work that was completed, some was performed on the fixed platform, but all the welding work was performed on the PETER CALLAIS. While moving heavy equipment on the PETER CALLAIS's deck, Harry Thomas, a rigger employed by Magnolia, was injured when a wave propelled him into some welding equipment.

II.

Thomas sued Devon and other parties for his injuries. Devon filed a third-party complaint against Gulf Fleet and its insurer, Boston Old Colony Insurance Company ("Boston Old Colony"), for breach of contract and insurance obligations under the Devon/Gulf Fleet MSA. Devon filed third-party complaints

4

against Magnolia for breach of the insurance and indemnity provisions in the Devon/Magnolia MSA and against St. Paul for breach of its insurance obligations. Gulf Fleet and Boston Old Colony agreed to defend and indemnify Devon against Thomas's personal injury claims.

Devon, Gulf Fleet, and Boston Old Colony filed third-party claims against Petra for negligence and breach of its defense, indemnity, and insurance obligations under the Devon/Petra MSA; they also alleged that Boston Old Colony was subrogated to Devon's claims against Petra and that the failure of Petra's and Magnolia's insurance carriers (Gray and St. Paul, respectively) to indemnify Gulf Fleet and Boston Old Colony were breaches of the MSA's. Petra then sought and obtained leave to file a counterclaim against Gulf Fleet and Boston Old Colony alleging that Gulf Fleet and Boston Old Colony breached a contract to provide insurance to Petra.

Magnolia and Petra separately moved for summary judgment seeking dismissal of Devon's claims for defense, indemnity, and insurance coverage. They argued that Louisiana law governs the contract and that the indemnity and insurance obligations are unenforceable under the Louisiana Oilfield Indemnity Act ("LOIA"), which provides, in part, that "any provision contained in . . . an agreement pertaining to a well for oil, gas, or water . . . is void and unenforceable to the extent that it purports to or does provide for defense or indemnity . . . to the indemnitee against loss or liability for damages arising out of or resulting from death or bodily injury to persons. . . ." LA. REV. STAT. ANN. § 9:2780(B) (2005).

Magnolia and Petra also moved for summary judgment on Devon's breach of contract claims regarding their obligation to have Devon named as an additional insured. Devon filed responses and filed cross-motions for summary judgment, arguing that the indemnity and insurance provisions were enforceable under maritime law and that summary judgment was appropriate for Devon's breach of contract claims regarding the "additional insured" provisions.

5

The district court granted in part and denied in part each summary judgment motion. The court found that Petra and Magnolia had not breached their contractual obligation to have Devon named as an additional insured; consequently, it granted Petra's and Magnolia's motions as to the "additional insured" breach of contract claims and denied Devon's motions on these claims. The court also found that maritime law governs the MSA's and that the indemnity and insurance provisions are valid and enforceable. It therefore granted Devon's motion as to the indemnity and insurance claims and denied Magnolia's and Petra's motions on those claims.

St. Paul moved for summary judgment on Devon's claims that St. Paul had breached its contractual obligation to insure Devon. St. Paul argued (i) that the LOIA renders the "additional insured" provision unenforceable and (ii) that St. Paul does not owe Devon anything under Magnolia's CGL policy because Devon breached its contract with Magnolia by failing to reimburse Magnolia for the insurance premiums. The district court denied St. Paul's motion. It concluded that maritime law governs the MSA and that the additional insured provisions are therefore valid and enforceable. It also held that Devon's conduct did not breach the CGL policy between Magnolia and St. Paul and that St. Paul is therefore required to insure Devon as required by the policy.

In this interlocutory appeal, Magnolia, Petra, and St. Paul assert that the district court erred in concluding that maritime law governs the MSA's. They argue that the district court should have concluded that the MSA's are governed by Louisiana law, under which the defense, indemnity, and insurance provisions are void and unenforceable. St. Paul also asserts that it was entitled to summary judgment on Devon's breach of contract claim as to the "additional insured" provision in Magnolia's CGL policy. The appeals have been consolidated in this proceeding.

6

## III.

Devon claims that this court does not have jurisdiction. The regional courts of appeals have jurisdiction over "[i]nterlocutory decrees of such district courts or the judges thereof determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed." 28 U.S.C. § 1292(a)(3) (2000). "Courts have tended to construe this provision rather narrowly and it has not been read to permit interlocutory appeals in admiralty except where the order, regardless of the label affixed to it had the effect of determining the rights and obligations of the parties." In re Complaint of Ingram Towing Co., 59 F.3d 513, 516 (5th Cir. 1995). But it is "not necessary for all of the rights and liabilities of all of the parties [to] be determined" as long as "the order appealed from . . . conclusively determine[d] the merits of a claim or defense." Associated Metals & Minerals Corp. v. ALEXANDER'S UNITY MV, 41 F.3d 1007, 1010 (5th Cir. 1995) (internal quotations omitted).

The district court determined that "Magnolia [and Petra] must indemnify Devon according to the terms of the MSA" and that "St. Paul must insure Devon as required by the [CGL] policy." Even though there are unresolved issues affecting the parties' rights and liabilities, the district court's orders determined the rights and liabilities of the parties with respect to the primary indemnity and insurance claims at issue in these disputes. We therefore have jurisdiction over these interlocutory appeals, so we deny Devon's motion to dismiss for want of jurisdiction.

## IV.

We review the denial of summary judgment de novo, using the same standards as did the district court. Strong v. B.P. Exploration & Prod., Inc., 440 F.3d 665, 668 (5th Cir. 2006). The principal issue is whether the MSA's are governed by maritime law or Louisiana law. Maritime law applies to contracts determined to be maritime in nature. "Determination of the nature of a contract de-

pends in part on historical treatment in the jurisprudence and in part on a fact-specific inquiry." Davis & Sons, Inc. v. Gulf Oil Corp., 919 F.2d 313, 316 (5th Cir. 1990). We determine whether a contract is maritime by applying the six-factor test in Davis & Sons, Inc. v. Gulf Oil Corp., 919 F.2d at 316: "(1) [W]hat does the specific work order in effect at the time of injury provide? (2) what work did the crew assigned under the work order actually do? (3) was the crew assigned to work aboard a vessel in navigable waters? (4) to what extent did the work being done relate to the mission of that vessel? (5) what was the principal work of the injured worker? and (6) what work was the injured worker actually doing at the time of injury?" "The maritime or non-maritime status of the contract ultimately depends on its 'nature and character,' not on its place of execution or performance." Hoda v. Rowan Co., 419 F.3d 379, 381 (5th Cir. 2005) (quoting Davis, 919 F.2d at 316).

## A.

In some cases, the historical treatment in the jurisprudence may obviate the need for a fact-specific inquiry. Because, however, we have not previously considered whether a contract to repair a fixed platform is maritime, this first prong of the Davis analysis is inconclusive. Nevertheless, our cases dealing with offshore oil and gas contracts provide helpful suggestions on how the present case should be resolved.[1]

The defendants argue that a contract for the mere repair of a fixed platform cannot be maritime, because this court held in Laredo Offshore Constructors, Inc. v. Hunt Oil Co, 754 F.2d 1223, 1231 (5th Cir. 1985), that a contract for the construction of a fixed offshore platform is not maritime. In Laredo, however, it was the plaintiff's failure to complete its contractual obligations to con-

---

[1] Cf. Hoda, 419 F.3d at 381 (5th Cir. 2005) ("Davis's initial reference to the 'historical treatment in the jurisprudence,' while inconclusive, is nonetheless suggestive, for present purposes.").

struct the platform that "gave rise to" the lawsuit. Id. We noted that the result might be different where the subject matter of a contract has a "direct relationship with . . . traditional subjects of maritime law." Id.

We also held in Domingue v. Ocean Drilling & Exploration Co., 923 F.2d 393, 397 (5th Cir. 1991), that where a contract is only incidentally related to a vessel's mission, it is not maritime.[2] Domingue involved a contract for wireline services on an offshore well. Id. at 394. The work order required the crew to use a jack-up drilling rig. Id. Although a jack-up rig has been classified as a vessel for maritime law purposes,[3] in Domingue the use of a vessel was purely incidental to the execution of the contract, and nothing about the contract required that the contractor use a vessel instead of a mere work platform. Id. at 395, 397.

In contrast, the work in Campbell v. Sonat Offshore Drilling, Inc., 979 F.2d 1115, 1123 (5th Cir. 1992), required the use of a vessel as such. Campbell involved casing work that required the use of a vessel such as a jack-up rig, along with its derrick and draw works, because there was no fixed platform or derrick at the work site. Id. Similarly, in Davis we noted that the "particular nature of the terrain and production equipment required" the use of a vessel. Davis & Sons, Inc., v. Gulf Oil Corp., 919 F.2d 313, 317 (5th Cir. 1990). Davis involved a work crew that traveled from one offshore job site to another and made various repairs to the offshore facilities and thus required a vessel "that could function as a mobile work platform." Id.

In Hoda, 419 F.3d at 379, 381, 383, we addressed an analogous situation in which the crew's "exact work did not require the use of [a] vessel," but the work "could not be performed without the [vessel's] direct involvement." Hoda involved the torquing up and down of the bolts on blowout preventer stacks, a

---

[2] See also Laredo, 754 F.2d at 1231 ("That the contract contemplated in part the use of instruments of admiralty . . . is not sufficient" to refrain from applying state law.).

[3] See Vickers v. Chiles Drilling Co., 822 F.2d 535, 537 (5th Cir. 1987).

task that by itself did not require the use of the vessel or its crew but that would have been irrelevant and impossible if the vessel's crew had not used the vessel's rig to set the stacks and bolts in place. Id. at 381.

The punch list required Magnolia's crew to make certain repairs to Devon's platform. Although the "exact work" on the punch list did not require the use of a vessel per se, the failure of the parties to obtain a hot work permit meant that the welding work, which was a prerequisite for completing some of the tasks on the punch list, had to be completed on a vessel, not the fixed platform. We deemed the wireline contract in Domingue, 923 F.2d at 397, non-maritime because the need for a vessel arose purely from the lack of a fixed platform. The contract here required that the parties provide a vessel per se, because only a vessel working alongside the already existing fixed platform could provide a suitable place to perform the hot work. As was the case in Davis, Campbell, and Hoda, the instant contract required that a vessel be provided.[4]

It is undisputed that the hot work could have been completed on the oil and gas platform if the appropriate permit had been obtained. The inability to perform the hot work on the vessel was not caused by any physical or technical limitations but by the legal limitations resulting from the absence of a permit. That is, however, a distinction without a legal difference. Hoda, Davis, and Campbell do not require that the need for a vessel be caused by physical or technical limitations. There is no practical difference between having to use a vessel because of physical realities and having to use one because of legal restrictions. A vessel is required in both situations.

The jurisprudence therefore indicates that where the use of a vessel as such is required for completion of the contract, maritime law appropriately governs. We must now apply the six-factor Davis test to the facts.

---

[4] See also Demette v. Falcon Drilling Co., 280 F.3d 492, 500-01 (5th Cir. 2002) ("Even a contract for offshore drilling services that does not mention any vessel is maritime if its execution requires the use of vessels. This is true for contracts that may also involve obligations performed on land.").

The parties ask us to consider whether the Davis factors should be analyzed in terms of what the parties expected would happen, or rather in terms of what actually happened during performance of the contract. Magnolia claims the parties expected that all the work would take place on the fixed platform. According to defendants, we should apply the Davis factors to the facts as the parties intended them when the punch list was submitted pursuant to the MSA's. Defendants contend that an intent-based analysis would compel the conclusion that the contract is non-maritime and accordingly that Louisiana law applies. Devon, on the other hand, argues that the Davis factors must be applied to the facts as they actually occurred: Because some of the work was required to take place on a vessel, Devon says that that approach compels the conclusion that the contract is maritime, so maritime law should apply.

The Davis factors primarily address the nature and character of the contract as it was actually executed; that conclusion finds support in the specific language of the factors themselves. The second and sixth factors speak in terms of what "actually" happened in the performance of the contract. Factors three, four, and five use the past tense to analyze what kind of work "was" being done and how it was accomplished. Only the first factorSSwhat does the specific work order in effect at the time of injury provide—uses language that could be interpreted as taking an ex ante view of the contract. But the first factor also analyzes the specific work order "in effect at the time of injury," thus possibly contemplating that the work order "in effect" when the injury occurred could be different from the parties' ex ante expectations.

Viewed in this way, the Davis factors suggest that the contract is maritime. Factor six weighs strongly in favor of finding a maritime contract, because the injured worker was engaged in the inherently maritime task of securing the vessel's cargo at the time of injury. Similarly, factors two and five weigh in favor of finding a maritime contract, because there is no dispute that Thomas and the

crew were required to use, and actually did use, the vessel qua vessel.

Regarding factor three, we agree with the district court's determination that when the vessel departed for the platform without the requisite permit, the crew was necessarily assigned to do some of its work on the vessel. Factor one asks us to evaluate the work order in effect at the time of the injury. Although the contract initially may have been contemplated as non-maritime because all of the work on the punch list could have been performed on the fixed platform, the work order as implemented by the parties required that they use a vessel to complete some of the required tasks.

Factor four requires us to analyze the relationship between the work performed and the mission of the vessel. We agree with the district court that part of the mission was to aid in the repairs to the platform. Some of that work required the vessel to convey people and cargo to the repair site, a task integral to completing the repairs. Thomas's work as a rigger, which involved loading and unloading cargo to and from the vessel, was certainly related to the transportation function of the vessel and contributed to the repair of the platform. Similarly, the hot work that took place on the vessel was "integral" in repairing the platform, a task that was part of the vessel's mission.[5] The Davis factors thus weigh in favor of finding that the contract is maritime.

Even if we were to adopt an approach that focused on the parties' ex ante expectations, we likely would reach the same result. The MSA's have a clause that states, "This Contract shall be governed by the General Maritime laws of the United States" unless it is judicially determined that such laws do not apply. That language indicates that the parties intended and expected that maritime law would apply. As we noted in Hoda, 419 F.3d at 380 n.3, "[o]ur conclusion that maritime law applies is consistent with the contract."

Because we conclude that maritime law applies to the MSA's, the indem-

---

[5] See Hoda, 419 F.3d at 383 (citing Demette v. Falcon Drilling Co., 280 F.3d 492, 501 (5th Cir. 2002)).

nity provisions contained therein are valid and enforceable. We do not reach the issues of whether and to what extent Louisiana law applies.

V.

St. Paul raises the ancillary argument that, even if maritime law applies, St. Paul is not required to insure Devon pursuant to the additional insured provisions in the CGL policy between St. Paul and Magnolia. St. Paul contends it had no obligation to insure Devon because Devon breached its contract with Magnolia by failing to reimburse Magnolia for the insurance premiums.

St. Paul has abandoned this argument on appeal, because it has inadequately briefed it. St. Paul points to evidence in the record that Devon did not make premium payments; it uses that evidence primarily to urge that the additional insured provision is unenforceable under the LOIA. In addition, St. Paul includes one paragraph arguing that Devon is not entitled to additional insured coverage even if the LOIA does not apply:

> In the alternative, Devon is not entitled to additional insured coverage regardless of whether [LOIA] applies. Devon is not entitled to be named as an additional insured, because Devon breached its obligation to pay Magnolia for the additional insured coverage and, therefore, no such additional insured obligation existed.

This single paragraph with no citations to authority is insufficient to constitute an argument on appeal. We have consistently held that such arguments are abandoned for inadequate briefing. In L & A Contracting Co. v. S. Concrete Servs., Inc., 17 F.3d 106, 113 (5th Cir. 1994), we held that a party had abandoned a challenge because of inadequate briefing by citing "no authority in its one-page argument on the attorney fee question."[6] Similarly, in Kohler v. Englade, 470 F.3d 1104, 1114 (5th Cir. 2006), we held that a party had inade-

---

[6] See also In re Bouchie, 324 F.3d 780, 786 (5th Cir. 2003) ("As Rush Truck cites no authority for this proposition, it is not adequately briefed and is therefore waived.").

quately briefed an issue because "he failed to cite any legal authority for the proposition that one has a constitutional right to have an executed search warrant filed under seal." We have also held that an argument consisting solely of one citation to an authority constituted inadequate briefing. See Salazar-Regino v. Trominski, 415 F.3d 436, 452 (5th Cir. 2005), vacated on other grounds, 127 S. Ct. 827 (2006).

In sum, maritime law applies to the MSA's, so we AFFIRM as to the defense, indemnity, and insurance issues raised on appeal, and we REMAND for further proceedings.