**REVISED February 27, 2017**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

February 23, 2017

Lyle W. Cayce
Clerk

No. 16-30217

In Re: In the Matter of the Complaint of Larry Doiron, Incorporated as
Owner and Operator of the Barge Pogo and M/V Billy Joe for Exoneration
from or Limitation of Liability

LARRY DOIRON, INCORPORATED,

      Plaintiff - Appellee

ROBERT JACKSON,

      Intervenor Plaintiff - Appellee

v.

SPECIALTY RENTAL TOOLS & SUPPLY, L.L.P.; OIL STATES ENERGY
SERVICES, L.L.C.; ZURICH AMERICAN INSURANCE COMPANY,

      Defendants - Appellants

Appeal from the United States District Court
for the Western District of Louisiana

Before DAVIS, DENNIS, and SOUTHWICK, Circuit Judges.

LESLIE H. SOUTHWICK, Circuit Judge:

     We are yet again required to determine whether a contract is a maritime
one. Here, the focus is on a contract to perform flow-back services to improve

the performance of an offshore natural-gas well when performance eventually required the use of a crane barge. Plaintiffs Larry Doiron, Inc. and Robert Jackson argue that maritime law applies. Defendants Specialty Rental Tools & Supply, Oil States Energy Services, and Zurich American Insurance Company (collectively, "STS") argue that state law, specifically that of Louisiana, applies. The district court determined the contract was maritime in nature. We conclude the question is close but agree that the specific contract at issue, which was an oral work order in effect at the time of injury, should be considered maritime. AFFIRMED.

## FACTUAL AND PROCEDURAL BACKGROUND

On October 12, 2005, Apache Corporation and STS entered into a master services contract ("MSC"). The MSC does not describe individual tasks but operates as a "broadform blanket agreement" that contemplates future tasks to be performed under subsequent work orders to be agreed upon as necessary.[1] The MSC contains an indemnification provision that requires STS to defend and indemnify Apache and its "Company Group" against all claims for property damage or bodily injury. On appeal, the parties do not dispute that Larry Doiron, Inc. ("LDI") and Jackson are part of Apache's Company Group and are covered by the terms of the MSC.[2]

---

[1] The MSC provides: Apache "may, from time to time, request Contractor [STS] to perform work or render services hereunder ('Work') including but not limited to the following types of services: Chemicals, Equipment Rental."

[2] Before the district court, STS argued that VAS Gauging, Inc. — and not Apache — contacted LDI to procure the crane barge. As such, it argues, LDI was not in contractual privity with Apache, so "STS would not owe LDI and Mr. Jackson defense and indemnity even if the general maritime law is held to apply to the MSC." Neither party briefed this issue on appeal, so we need not address it here. *See United States v. Martinez*, 263 F.3d 436, 438 (5th Cir. 2001).

In early 2011, Apache hired Specialty Rental Tools & Supply ("STS") to perform flow-back services on its offshore well, located in West Lake Verret in the Atchafalaya Basin. The flow-back process is designed to dislodge solid objects from inside the well to "get it to produce gas again." The work was to be performed on Apache's fixed production platform. The flow-back services were arranged by an oral work order; neither party produced a written agreement for these particular services.

On February 24, 2011, STS sent its employees Peter Savoie and Matt Delahoussaye to perform the flow-back operation. After being unsuccessful that day, Savoie informed Brandon LePretre, Apache's representative, that STS would need additional equipment to perform the operation, including a flow-back iron, a hydraulic choke manifold, and a hydraulic gate valve. In Savoie's estimation, STS would also need a crane barge because the additional equipment was too heavy for the workers to remove from the wellhead. LePretre contacted VAS Gauging, Inc., which arranged for LDI to provide the crane barge POGO[3] for use at the Apache well. Robert Jackson was the crane operator. LePretre testified that he knew LDI owned the barge and that it was used at the well site with Apache's consent.

On the second day of the flow-back operation, Savoie and Delahoussaye were again unsuccessful, even with use of the crane. Savoie informed LePretre that he needed a coiled tubing unit, so they terminated the operation until one could be obtained. Savoie began "rigging down" and directed Jackson to lower the crane. Instead, Savoie reported the crane came toward him and "knocked

---

[3] We have previously recognized that a barge is a vessel if it is "equipped for use in navigable waters, ha[s] traveled a considerable distance through such waters to its present site and was, at the time of the accident, located in a navigable canal." *Producers Drilling Co. v. Gray*, 361 F.2d 432, 437 (5th Cir. 1966). Neither party disputes that the POGO qualifies as a vessel, so we do not engage in any analysis of the barge's classification.

[him] off balance." He clutched the crane to avoid falling backward but eventually lost his grip, which caused him to fall approximately eight feet onto the deck of the barge. His accident resulted in "a crush type injury to the right lower extremity."

Later that year, LDI made a formal demand that STS defend and indemnify LDI against any claims Savoie may bring. STS rejected the demand. LDI then filed a Vessel Owner Limitation Action for exoneration from liability on the basis of admiralty jurisdiction under 46 U.S.C. §§ 30501–30512. Savoie answered the complaint, alleging he was injured by LDI's negligence and through no fault of his own. LDI then filed a third-party complaint against STS and its affiliates. Jackson intervened in the Vessel Owner Limitation Action, seeking protection under the MSC and the insurance policy issued by Zurich. STS ultimately settled with Savoie, and the district court severed the indemnity claims from the personal-injury case.

LDI and Jackson filed a motion for summary judgment to "enforce their contractual right to defense and indemnity." LDI and Jackson argued the MSC obligated STS to indemnify LDI and Jackson against Savoie's claims. In response, STS filed a cross-motion for summary judgment, arguing that the MSC "must be construed under Louisiana law and that the indemnity provision contained therein is void and unenforceable under the Louisiana Oilfield Indemnity Act." The district court granted the motion submitted by LDI and Jackson and denied the cross-motion submitted by STS.

Thereafter, the parties filed a joint motion to dismiss the claims not resolved by summary judgment and for entry of final judgment on the others. The parties reserved the right to appeal "the limited issue of whether Defendants were contractually obligated to defend and indemnify

4

Plaintiffs . . . ." The court granted the motion and entered final judgment on March 10, 2016. STS filed a timely notice of appeal.

## DISCUSSION

We review *de novo* the district court's grant of summary judgment. *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 68 (5th Cir. 2014). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute exists if a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All facts and evidence are viewed in the light most favorable to the non-movant. *James*, 743 F.3d at 68.

The issue here is whether maritime or state law should be applied to determine the validity of the MSC's indemnity clause. The MSC contains a choice-of-law provision:

> This contract shall be construed and enforced in accordance with the general maritime law of the United States whenever any performance is contemplated in, on or above navigable waters, whether onshore or offshore. In the event that maritime law is held inapplicable, the law of the state in which the work is performed shall apply.

The district court correctly analyzed the conflict as being one between Louisiana state law and general maritime principles. The Louisiana Oilfield Indemnity Act provides that indemnity clauses in "agreements pertaining to wells for oil, gas, or water" are void as violations of public policy. LA. REV. STAT. § 9:2780. Maritime law "does not bar enforcement of [those] provisions." *Hoda v. Rowan Cos.,* 419 F.3d 379, 380 (5th Cir. 2005). There are, though, no

"clean lines between maritime and nonmaritime contracts." *See Norfolk S. Ry. Co. v. Kirby*, 125 S. Ct. 385, 393 (2004).

We articulated the legal framework for deciding cases like this in *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir. 1990). Distinguishing between maritime and non-maritime contracts "turns on a minute parsing of the facts," but we are bound by the *Davis* approach — however inexact it may be. *Hoda*, 419 F.3d at 380–81. In *Davis*, the parties entered a Master Service Agreement under which Gulf Oil would issue work orders directing Davis to perform specific tasks related to its natural-gas and crude-oil wells. *Davis*, 919 F.2d at 314. The agreement contained an indemnity clause requiring Davis to indemnify Gulf Oil against any claims that may arise out of their relationship. *Id.* Under the work order at issue, Davis supplied land-based barges to perform routine maintenance on the wells. *Id.* The work platforms around the wells did not provide adequate workspace, so most of the work was done on the barge itself. *Id.*

On the day of the accident in *Davis*, the barge employee supervising the operation drowned. *Id.* His representatives sued both Davis and Gulf Oil, and the parties settled. *Id.* at 315. Davis sought a declaratory judgment that Louisiana law governed the contract and that the indemnity provision was therefore void. *Id.* Gulf Oil argued that maritime law applied to validate the indemnity provision. *Id.* The district court applied Louisiana law. *Id.*

On appeal, we held that when a contract involves two parts — "a blanket contract followed by later work orders" — the two must be interpreted together to determine whether maritime or state law applies. *Id.* We then articulated a two-part analysis. *Id.* at 316. First, we determine the nature of the contract by reference to its historical treatment. *Id.* If the historical treatment is unclear, we must consider six factors:

1) [W]hat does the specific work order in effect at the time of injury provide? 2) [W]hat work did the crew assigned under the work order actually do? 3) [W]as the crew assigned to work aboard a vessel in navigable waters[?] 4) [T]o what extent did the work being done relate to the mission of that vessel? 5) [W]hat was the principal work of the injured worker? and 6) [W]hat work was the injured worker actually doing at the time of injury?

*Id.*; *see also Hoda*, 419 F.3d at 381. In *Davis*, the work being performed was not historically maritime in nature. *Davis*, 919 F.2d at 316. Nonetheless, an analysis of the factors revealed "[t]he work done by the crew of Barge 11171 was inextricably intertwined with maritime activities since it required the use of a vessel and its crew." *Id.* at 317.

Applying *Davis*, we find no clarity to the historical treatment of contracts like because this court has not previously considered flow-back operations. We have found contracts for the provision of wireline services to be non-maritime. *See, e.g.*, *Domingue v. Ocean Drilling & Expl. Co.*, 923 F.2d 393, 397–98 (5th Cir. 1991); *Thurmond v. Delta Well Surveyors*, 836 F.2d 952, 956 (5th Cir. 1988). Wireline services include providing maintenance for partially drilled oil and gas wells and gathering "geophysical data relevant to production." *Domingue*, 923 F.2d at 394 n.3. On the other hand, contracts for casing services are maritime in nature. *See, e.g.*, *Demette v. Falcon Drilling Co.*, 280 F.3d 492, 500 (5th Cir. 2002), *overruled on other grounds by Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778, 787 (5th Cir. 2009) (en banc); *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1123–24 (5th Cir. 1992). Casing is "the welding together and hammering of pipe into the subsurface of the earth to create a permanent construction." *Campbell*, 979 F.2d at 1118 n.2. One distinction between the two is that wireline services often do not require the use of a vessel; casing services do. *Compare*

*Thurmond*, 836 F.2d at 956, *with Campbell*, 979 F.2d at 1123. Whether that distinction was sufficient to cause the different outcomes is unclear.

We now examine flow-back operations to see if they are comparable either to wireline operations or to casing services. When providing flow-back services, employees use whatever equipment is necessary to clear the well for the resumption of production. The services themselves may be performed exclusively on the well platform or may, as here, require a vessel to be alongside the well. The district court was likely correct that "flow back services have little to do with traditional maritime activity or commerce." Even if flow-back services in the main are not maritime, this is not a sufficient answer under *Davis*. Because the historical treatment is unclear, we cannot rely on a generic view of the work; instead, we must consider the circumstances surrounding the injury. *See Devon Louisiana Corp. v. Petra Consultants, Inc.*, 247 F. App'x 539, 544 (5th Cir. 2007) (unpublished).

Under *Davis*. no single factor is dispositive. We find that four of the six factors — one, two, four, and six — indicate this contract is maritime in nature. The first factor concerns the specific work order in effect at the time of the injury. *Davis*, 919 F.2d at 316. Neither party can produce a written document to establish what the parties contemplated when this particular agreement arose. The MSC references vessels by requiring insurance coverage when the "contractor uses any vessels in connection with its work for Company or Company Group." While this factor concerns the specific work order and not the MSC, the language of the MSC indicates the parties at least contemplated the use of a vessel during the operations for which Apache would employ STS. Imposing a maritime obligation would not cause unfair surprise.

The second factor examines the work the crew assigned under the work order actually performed. *Id*. The STS crew performed a flow-back operation,

which is not primarily maritime. In fact, however, Savoie and Delahoussaye relied on the crane barge to execute the flow-back operation, and Savoie was injured as a result of its use. The district court noted that the operation "could not have been completed without the use of a crane barge . . . ." We agree. STS claims the barge was ancillary to the flow-back operation, but the presence of the barge was a necessary predicate to Savoie's using the hydraulic gate valve.

The fourth factor concerns the extent to which the work being done related to the mission of the vessel. *Id.* The barge was sent to Apache's well site to serve STS in the execution of its flow-back job. STS notes that the barge was forced to move away from the well during the flow-back process to avoid safety concerns raised by having an ignition source near a gas well. Despite its physical location at the time of the operation, though, the barge was still tasked with assisting STS in its execution of the flow-back operation.

The sixth factor concerns what the injured worker was doing at the time of his injury. *Id.* Savoie, at the time of injury, was preparing to disconnect the hydraulic gate valve from the crane. During "rigging down," Savoie clutched the crane itself and fell onto the deck of the barge when he lost his grip. Thus, Savoie was injured by equipment affixed to the vessel itself.

Only the third and fifth factors militate against applying maritime law. The third factor concerns whether the crew was assigned to work aboard a vessel in navigable waters. *Id.* Neither Savoie nor Delahoussaye was assigned to work aboard the crane barge. Still, Savoie made use of the barge by loading and unloading equipment from its deck, conducting safety meetings on board the vessel,[4] and using the crane to install large equipment on the platform.

---

[4] STS states neither Savoie nor Delahoussaye boarded the barge. Delahoussaye testified that no one from STS went onto the barge "during the actual flow back services" but made no representations as to whether he had boarded the barge at other times. The district

The fifth factor concerns the principal work of the injured person. *Id.* At the time of his injury, Savoie was principally employed to perform the flow-back operation at issue; he was not commissioned to be a seaman. Yet Savoie need not be a sailor to give this work order a "peculiarly salty flavor." *See Thurmond*, 836 F.2d at 953, 956.

Some of the cases that have applied *Davis* assist us in our analysis. The gravamen of our inquiry is not whether the contract required use of a vessel but whether the *execution* of the contract required a vessel. *Demette*, 280 F.3d at 500–01. STS correctly notes that "incidental or preparatory use of a vessel" is not sufficient to render a contract maritime in nature. On the other hand, when the work is "inextricably intertwined with maritime activities," the contract will be maritime. *Davis*, 919 F.2d at 317.

We find useful similarities between this case and *Campbell*, where a worker performing casing services was injured when transferring from one vessel to another. *See Campbell*, 979 F.2d at 1122–23. First, neither this operation nor the operation in *Campbell* was intrinsically maritime; both may have been performed on a fixed surface instead of a vessel. Second, a vessel at some point became necessary to execute the operations in both cases. Also, both Savoie and the injured worker in *Campbell* suffered their injuries while transferring to a vessel that had been used during the operation. Finally, and most importantly, the vessel's equipment was used to accomplish the relevant task both here and in *Campbell*. Given the similarities, Savoie's work, like the work in *Campbell*, was "inextricably intertwined with maritime activities . . . ." *See id.* at 1123 (quoting *Davis*, 919 F.2d at 317).

---

court found that STS personnel had, at minimum, conducted safety meetings alongside the barge's crew.

We also find similarities between this case and *Hoda*, where a worker was injured while working aboard a vessel. *See Hoda*, 419 F.3d at 380. His primary job under that work order was to tighten the nuts on a blow-out preventer on the wellhead. *Id*. at 381. The operation was performed using a crane aboard the vessel because there was no well platform. *Id*. In this case, Apache had a fixed well platform from which the flow-back operation could have been executed. Regardless, the existence of the fixed platform is immaterial because the use of a vessel eventually became necessary to manipulate the heavy equipment used during the operation. Like the injured worker in *Hoda*, Savoie would "have had nothing to do" had LDI not provided the crane barge. *See id*. Savoie's work depended on the barge's direct involvement, which strongly indicates a maritime contract. *See id*. at 383

*Devon*, an unpublished case from this court, is also analogous. There, the worker was injured aboard a vessel during inclement weather. *Devon*, 247 F. App'x at 541–42. At the time of his injury, he was working to repair an offshore well, and the operation required use of welding equipment. *Id*. Prior to the operation, the workers failed to secure a "hot work" permit, which precluded performance of welding operations on the well platform. *Id*. at 541. Thus, the welding equipment remained on the vessel, and the procedures were performed on the vessel itself. *Id*. On appeal, we decided the contract was maritime in nature because the work at issue required the vessel's direct involvement. *Id*. at 544–45. We noted that, but for the employees' failure to secure a permit, the work could have been performed on a fixed platform. *Id*. at 545. It was fair to say, then, that the operation in fact required a vessel. *Id*. This case is similar. Although Apache had a fixed production platform from which the work could have been done, Savoie relied on the crane barge to

perform the job when he realized he could not manipulate the heavy equipment alone. This should thus be seen as a maritime operation.

STS relies on *Thurmond* and *Domingue* to support its position. In *Thurmond*, decided before *Davis*, Gulf Oil contracted with P & S Well Services for a barge bearing equipment for the performance of wireline services. *Thurmond*, 836 F.2d at 953. Thurmond, a member of the barge's crew, was injured when he "stepped off the barge and on the wellhead[.]" *Id*. We held the contract to be nonmaritime, noting that Thurmond was "not engaged in the performance of a maritime obligation" at the time of his injury. *Id*. at 955. We also found significant that the parties' contract did not address the use of a vessel. *Id*. In *Domingue*, also concerning wireline services, the injured worker tripped over a piece of equipment the vessel's crew had placed on the well platform. *Domingue*, 923 F.2d at 394. We held that the vessel was "incidental . . . [to] the execution of [the] particular service contract." *Id*. at 397.

*Thurmond* and *Domingue* have been distinguished by this court under circumstances similar to this case. *See, e.g.*, *Campbell*, 979 F.2d at 1122; *Davis*, 919 F.2d at 316. Neither wireline nor flow-back services are themselves maritime activities. The flow-back services in this case, though, could not have been completed without a vessel that was more than ancillary to the operation. Also, Savoie was not injured as a result of the flow-back operation but because of Jackson's operation of the crane, which was affixed to the vessel. Both workers in *Thurmond* and *Domingue* were on the well platform at the time of injury, but Savoie clutched the crane and fell onto the deck of the barge.

Further, unlike the contract in *Thurmond*, the MSC contemplated the use of a vessel, showing that both Apache and STS recognized a vessel could be necessary to the performance of its future work orders. The contract does not mention the crane barge specifically, but the MSC was a blanket

12

agreement that did not create present obligations. Instead, it required STS to accommodate Apache's work orders at unspecified future dates. In addition, "the *Davis* factors must be applied to the facts as they actually occurred" and not "as the parties intended them" to occur. *See Devon*, 247 F. App'x at 545. Even if the parties did not expect a vessel would be used during the flow-back operation, one was.

STS also relies on one of our recent nonprecedential decisions, *Riverside Construction Company, Inc. v. Entergy Mississippi, Inc.*, 626 F. App'x 443 (5th Cir. 2015). We analyzed a repair contract for Entergy's Dolphin Fender System located on a fuel dock in the Mississippi River. *Id*. at 444. Entergy removed the suit to federal court, arguing the contract was maritime because it "contemplated that [the] work would be performed from a floating barge . . . ." *Id*. at 445. We found that federal law did not apply and that removal was improper because the barge, which remained tethered to a bank during the operation, was merely used as a platform from which the work could be done — making it "auxiliary to the actual purpose of the contract[.]" *Id*. at 446.

*Riverside* is not factually analogous. No evidence exists to suggest the barge in this case remained tethered to a bank during the operation. Instead, it was close enough to the well platform — "located on navigable waters in West Lake Verret" — to permit the crane to access the wellhead.

STS also argues there is no basis for applying federal law to claims arising in Louisiana territorial waters, especially considering that state law applies to claims arising on the Outer Continental Shelf. The Outer Continental Shelf Lands Act extends the law of the adjacent state to the "subsoil and seabed" off its coast. 43 U.S.C. § 1333(a)(1). The adjacent state's law, though, is incorporated into federal law and "does not supplant admiralty and maritime law." ROBERT FORCE & MARTIN J. NORRIS, THE LAW OF

MARITIME PERSONAL INJURIES § 3:15 (2016). Accordingly, once we determine the contract is maritime, state law is irrelevant even on the Outer Continental Shelf. The policy of applying the law of the situs may seem appealing, but doing so would disrupt the "twin aims of maritime law": "achieving uniformity in the exercise of admiralty jurisdiction and providing special solicitude to seamen." *Miles v. Melrose*, 882 F.2d 976, 987 (5th Cir. 1989).

Finally, STS argues that "LDI's maritime tort is irrelevant to STS's contract." STS implies that Savoie's injury as a result of the barge is maritime, while the contract governing Apache's relationship with STS is not. In support, it notes that the personal injury lawsuit has been severed from this action, leaving us no tort issues to decide. As a result, it argues that LDI and Jackson are "attempt[ing] to cloud the nature and character of the [MSC] by emphasizing LDI's own maritime tort against Mr. Savoie." Peeling the maritime tort away from an ostensibly non-maritime contract is imaginative enough, but it is inconsistent with our prior treatment of analogous situations. The fact that Savoie brought an action in tort has no effect on our interpretation of the choice-of-law provision or our analysis of the relevant facts. The tort suit also has no bearing on the application of the indemnity provision, which is the direct subject of this appeal. In fact, the tort suit only bears passing relevance because LDI and Jackson would not be seeking indemnification otherwise. We recognize the basic distinction between tort and contract claims, but that distinction is immaterial here because our outcome holds regardless of the doctrinal lens through which the facts are viewed.

Our holding is confined to the facts before us. *See Hoda*, 419 F.3d at 383.

* * *

We conclude that the oral work order is the relevant contract and that it is a maritime contract. The district court did not err by determining maritime law applies. AFFIRMED.

W. EUGENE DAVIS, Circuit Judge, joined by LESLIE H. SOUTHWICK, Circuit Judge, specially concurring:

I concur in Judge Southwick's careful opinion which faithfully follows our precedent in *Davis & Sons*[1] and its progeny. I write separately to urge the court to take this case en banc and simplify the test for determining whether a contract is a maritime contract.

The multi-factor test in *Davis & Sons*, as set out in the majority opinion,[2] has been criticized by a number of judges of this court: in *Hoda v. Rowan Cos.*,[3] Judge Jones began the opinion by stating:

> This appeal requires us to sort once more through the authorities distinguishing maritime and non-maritime contracts in the offshore exploration and production industry. As is typical, the final result turns on a minute parsing of the facts. Whether this is the soundest jurisprudential approach may be doubted, inasmuch as it creates uncertainty, spawns litigation, and hinders the rational calculation of costs and risks by companies participating in this industry. Nevertheless, we are bound by the approach this court has followed for more than two decades.

---

[1] *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir. 1990).

[2] The six factors are:
> (1) [W]hat does the specific work order in effect at the time of the injury provide? (2) [W]hat work did the crew assigned under the work order actually do? (3) [W]as the crew assigned to work aboard a vessel in navigable waters? (4) [T]o what extent did the work being done relate to the mission of that vessel? (5) [W]hat was the principal work of the injured worker? and (6)[W]hat work was the injured worker actually doing at the time of injury?
> *Id.* at 316.

[3] 419 F.3d 379 (5th Cir. 2005) (concerning an indemnity claim on a contract to install a blowout preventer from a jack-up drilling rig).

16

In *Thurmond*,[4] Judge Garwood concurred in the opinion holding that a contract to provide wireline services that required use of a vessel was not a maritime contract. In his concurring opinion, however, he stated, "I am generally in agreement with Judge Wisdom's persuasive opinion, but am troubled by the tension, or perhaps outright inconsistency, between many of our opinions in this area."[5] And later,

> However, it seems to me that it may be desirable to consider this issue en banc, in order that we may take a more consistent approach to the question of whether and in what circumstances activities in connection with mineral development in state territorial waters are maritime (or perhaps "maritime and local").[6]

Professor David W. Robertson, in his article, pointed out some of the flaws in the *Davis & Sons* test:[7]

> The "historical treatment" reference does no more than remind courts and counsel to look for close analogies in the jurisprudence. This is what courts must always do when there is no clear governing general rule or principle. The six factors are too pointillistic: they have led Fifth Circuit panels down such odd lines of thought as "whether drilling mud services are more akin to wireline work [which has sometimes been viewed as quintessentially nonmaritime] or to casing services [which can be maritime if done on a vessel-type drilling rig.]"[8]

---

[4] *Thurmond v. Delta Well Surveyors*, 836 F.2d 952 (5th Cir. 1988).

[5] *Id.* at 957 (Garwood, J., concurring).

[6] *Id.* (citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 738 (1960)).

[7] For a more detailed criticism of the *Davis & Sons* test, *see* David W. Robertson, *The Outer Continental Shelf Lands Act's Provisions on Jurisdiction, Remedies, and Choice of Law: Correcting the Fifth Circuit's Mistakes*, 38 J. MAR. L. & COM. 487, 540-45 (2007).

[8] *Id.* at 545 (alteration in Robertson).

One problem with the multi-factor test in *Davis & Sons* is the lack of guidance about what weight to give each factor. A number of our cases seem to give the most weight to the *Davis & Sons* prong that requires examination of the precise work to be performed, e.g., wireline service, welding, casing service, or drilling. Most of our cases hold that a contract to provide any of these services on a vessel on navigable waters is a maritime contract, but panels have held that contracts to provide wireline services are non-maritime in nature whether the contractor contemplates that the services are to be performed from a vessel or not.[9] On the other hand, we have held that contracts to perform casing services are maritime because of the nature of casing work.[10]

A 2004 Supreme Court case, *Norfolk Southern Railway Co. v. Kirby*,[11] supports my view that the en banc court should abandon the *Davis & Sons* test. In *Kirby*, the Court was called upon to determine whether a bill of lading for a shipment of goods by sea from Australia to Charleston, South Carolina,

---

[9] *See Hollier v. Union Tex. Petroleum Corp.*, 972 F.2d 662, 665 (5th Cir. 1992) (holding that a contract for well testing on fixed platforms on the OCS is non-maritime); *Domingue v. Ocean Drilling & Expl. Co.*, 923 F.2d 393, 397-98 (5th Cir. 1991) (holding that a contract to provide wireline services to a jack-up rig operating on the OCS off the coast of Louisiana is non-maritime); *Thurmond*, 836 F.2d at 956-57 (holding that a contract to provide wireline services to a fixed platform in Louisiana state waters is non-maritime).

[10] *See Demette v. Falcon Drilling Co.*, 280 F.3d 492, 501 (5th Cir. 2002) (finding that because casing work "is an integral part of drilling," which is a "the primary purpose of the vessel" a contract for casing services is maritime); *Campbell v. Sonat Offshore Drilling, Inc.*, 979 F.2d 1115, 1121 (5th Cir. 1992) (holding that a contract to provide casing services is maritime); *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332 (5th Cir. 1981) (finding that circuit precedent compels the conclusion that a contract for casing services is maritime); *see also* Kenneth G. Engerrand, *Primer of Remedies on the Outer Continental Shelf*, 4 LOY. MAR. L.J. 19, 61-63 (2005) (noting that historically, some services contracts are considered maritime in nature, including drilling and workover, casing, catering, repair, and well-site supervision, while other services contracts are traditionally non-maritime in nature, including wireline work, testing and completion operations).

[11] 543 U.S. 14 (2004).

then by rail to Huntsville, Alabama was a maritime contract.[12] The goods were damaged in a train wreck during the land leg of the trip and the question was whether the suit to recover damages for property that was damaged on this leg of the trip fell within admiralty jurisdiction.[13] The Court concluded that both the land and water portions of the bills of lading constituted maritime contracts because their primary objective was to accomplish the transportation of goods by sea from Australia to the eastern coast of the United States.[14] Although the facts of this case are not closely analogous to those in today's case, the Court provided important guidance to assist us in determining whether a contract is a maritime contract:

> To ascertain whether a contract is a maritime one, we cannot look to whether a ship or other vessel was involved in the dispute, as we would in a putative maritime tort case. . . . Nor can we simply look to the place of the contract's formation or performance. Instead, the answer "depends upon . . . the nature and character of the contract," and the true criterion is whether it has "reference to maritime service or maritime transactions."[15]

And further "the fundamental interest giving rise to maritime jurisdiction is the protection of maritime commerce."[16]

Thus, in determining whether a contract being sued upon is a maritime contract, we should use contract principles rather than tort principles: We look

---

[12] *Id.* at 18-19.

[13] *Id.* at 21-22.

[14] *Id.* at 24.

[15] *Id.* (second alteration in original) (quoting *N. Pac. S.S. Co v. Hall Bros. Marine Ry. & Shipbuilding Co.*, 249 U.S. 119, 125 (1919) (citing *Ins. Co v. Dunham*, 78 U.S. 1, 16 (1870))); *see also Exxon Corp. v. Cent. Gulf Lines, Inc.*, 500 U.S. 603, 611 (1991) ("[T]he trend in modern admiralty case law . . . is to focus the jurisdictional inquiry upon whether the nature of the transaction was maritime.").

[16] *Id.* at 25 (emphasis removed) (internal quotation marks omitted) (quoting *Exxon*, 500 U.S. at 608 (quoting *Sisson v. Ruby*, 497 U.S. 358, 367 (1990), in turn quoting *Foremost Ins. Co. v. Richardson*, 457 U.S. 668, 674 (1982))).

to "the nature and character of the contract," "whether it has 'reference to maritime service or maritime transaction.'"[17] The Court called for a conceptual approach to the inquiry and the focus of the inquiry is the protection of maritime commerce.[18]

The six-prong test in *Davis & Sons* for determining whether the contract being sued upon is a maritime contract includes two prongs that are appropriate in a contract case: (1) what does the work order provide and (2) was the work to be performed on navigable water. The remaining factors are more appropriate in analyzing whether maritime tort jurisdiction can be exercised. In *Grand Isle Shipyard*, the en banc court encountered a similar question.[19]

In that case, another action to recover indemnity under a contract, we were faced with identifying the "situs of the controversy" under the Outer Continental Shelf Lands Act ("OCSLA").[20] If the situs was the Outer Continental Shelf ("OCS"), state law (Louisiana) applied and the indemnity agreement was unenforceable because of the Louisiana Oilfield Indemnity Act.[21] We overruled a number of our cases applying tort principles that held that the situs of the controversy for purposes of the OCSLA was the place of injury.[22] In *Grand Isle Shipyard*, the injury occurred on a vessel and the appellant argued that this was the situs of the controversy.[23] We disagreed

---

[17] *Id.* at 24-25.
[18] *Id.* at 25.
[19] *Grand Isle Shipyard, Inc. v. Seacor Marine, LLC*, 589 F.3d 778 (5th Cir. 2009) (en banc).
[20] *Id.* at 781.
[21] *Id.*
[22] *Id.* at 787-88 (overruling *Diamond Offshore Co. v. A&B Builders, Inc.*, 302 F.3d 531, 546 (5th Cir. 2002); *Demette*, 280 F.3d at 500; *Hodgen v. Forest Oil Corp.*, 87 F.3d 1512, 1527 (5th Cir. 1996); *Smith v. Penrod Drilling Corp.*, 960 F.2d 456, 459 (5th Cir. 1992); and *Hollier*, 972 F.2d at 664).
[23] *Id.* at 781-82.

and concluded that we should apply contract principles and determine where the majority of the work was to be performed under the contract.[24] Because most of the work contemplated under the contract was on stationary platforms on the OCS, we concluded that this location was the focus of the contract and the situs of the controversy.[25] This resulted in the application of state law as required under OCSLA.[26]

The same reasoning applies here. This is a suit on a contract for indemnity. We look to the blanket contract and the verbal work order for the nature and character of the contract; that is, what was the work STS was engaged to do on the well in West Lake Verret in the state of Louisiana. The answer is clear: they were engaged to work downhole from a stationary platform to dislodge downhole obstructions and get the gas well back on production. The contract did not call for any work on a vessel.

As it turned out, an unexpected problem developed that required a vessel equipped with a crane to complete the job. Apache engaged another party, LDI, to provide the vessel and crew for this work.

Considering all of the above, what is an appropriate test for determining whether a contract to provide oilfield services is maritime or non-maritime? Based on the Supreme Court's opinion in *Kirby*, our opinion in *Grand Isle Shipyard,* and the weight of our decisions in this area, I would substitute the following test for determining whether a contract for services to facilitate the drilling or production of oil and gas on state waters or the OCS is a maritime contract.

---

[24] *Id.* at 787.

[25] *Id.* at 787-88; *see also* ROBERT FORCE & MARTIN J. NORRIS, THE LAW OF MARITIME PERSONAL INJURIES § 13:9 (2016) (discussing cases applying the rule emanating from *Grand Isle Shipyard*).

[26] *Id.* at 789.

So long as a contract's primary purpose is to provide services to promote or assist in oil or gas drilling or production on navigable waters aboard a vessel, it is a maritime contract. Its character as a maritime contract is not defeated simply because the contract calls for incidental or insubstantial work unrelated to the use of a vessel.[27]

Under this test, a contract or work order to provide specialized services to promote the drilling and production of an oil or gas well from a vessel should be considered a maritime contract. If such a contract also provides for work on land or platforms that is incidental to the work on vessels or insubstantial in relation to the vessel-related work, this does not defeat the character of the contract as a maritime contract. Under this test and consistent with most of our cases, specialized services to promote drilling or production of oil or gas to be performed solely from a stationary platform should not be considered a maritime contract.

Our cases have consistently held that oil and gas drilling on navigable waters from a vessel is considered maritime commerce.[28] It follows that other services performed on a vessel in navigable waters to facilitate the drilling and production of oil and gas constitutes maritime commerce. Determining whether the contract is maritime should not depend on the nature of the particular oilfield services contracted for.

Applying this test to today's case, the verbal Apache work order called for STS to perform downhole work from a stationary platform to clear an obstruction in a gas well and get it back on production. This downhole work

---

[27] Professor Robertson recommends a similar test, *see* Robertson, *supra* note 7 at 548.

[28] *Theriot v. Bay Drilling Corp.*, 783 F.2d 527, 538-39 (5th Cir. 1986) ("Oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce."); *Pippen v. Shell Oil Co.*, 661 F.2d 378, 384 (5th Cir. 1981) ("[O]ffshore drilling the discovery, recovery, and sale of oil and natural gas from the sea bottom is maritime commerce . . . .").

on a stationary platform has no maritime or "salty" flavor that would qualify it as a maritime contract.

The fact that during the course of performing the work from the platform, a problem was encountered that required Apache to engage a vessel with a crane to assist in the job, does not alter the nature of Apache's contract with STS even though the STS crew performed incidental work to assist in connecting the vessel's crane to a load to be lifted.

## CONCLUSION

It is time to abandon the *Davis & Sons* test for determining whether or not a contract is a maritime contract. The test relies more on tort principles than contract principles to decide a contract case. It is too flexible to allow parties or their attorneys to predict whether a court will decide if a contract is maritime or non-maritime or for judges to decide the cases consistently. The Supreme Court's decision in *Kirby* reinforces this conclusion. Just as important, the above test will allow all parties to the contract to more accurately allocate risks and determine their insurance needs more reliably.